[16 NE3d 1165, 992 NYS2d 687]

QUADRANT STRUCTURED PRODUCTS CO., LTD., Individually and Derivatively on Behalf of ATHILON CAPITAL CORP., Appellant, v VINCENT VERTIN et al., Respondents.

Argued May 7, 2014; decided June 10, 2014

**POINTS OF COUNSEL**

*Bingham McCutchen LLP* (*Sabin Willett*, of the Massachusetts bar, admitted pro hac vice, and *Samuel Rowley*, of the Massachusetts bar, admitted pro hac vice, of counsel), and *Richards, Layton & Finger, P.A.*, Wilmington, Delaware (*Lisa A. Schmidt, Catherine G. Dearlove* and *Russell C. Silberglied* of counsel), for appellant. I. Under New York law, as a matter of plain language, the absence of the phrase "or the securities" from the no-action clause renders it inapplicable to Quadrant Structured Products Company, Ltd.'s claims. (*Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*, 14 NY3d 419; *Greenfield v Philles Records*, 98 NY2d 562; *Helmsley-Spear, Inc. v New York Blood Ctr.*, 257 AD2d 64; *Suffolk County Water Auth. v Village of Greenport*, 21 AD3d 947; *Greenwich Capital Fin. Prods., Inc. v Negrin*, 74 AD3d 413; *Maurice Goldman & Sons v Hanover Ins. Co.*, 80 NY2d 986; *Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71, 13 NY3d 270.) II. New York law shows that, by its plain language, the no-action clause does not bar Quadrant Structured Products Company, Ltd.'s claims. (*General Inv. Co. v Interborough R.T. Co.*, 200 App Div 794, 235 NY 133; *Deutsch v Gutehoffnungshutte, Aktienverein Fur Bergbau und Huttenbetrieb*, 168 Misc 872; *Lidgerwood v Hale & Kilburn Corp.*, 47 F2d 318; *Rudick v Ulster & Delaware R.R.*, 147 Misc 637; *Cruden v Bank of N.Y.*, 957 F2d 961; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d 684, 35 Misc 3d 1207[A], 2012 NY Slip Op 50601[U]; *Elliott Assoc. v J. Henry Schroder Bank & Trust Co.*, 838 F2d 66; *AMBAC Indem. Corp. v Bankers Trust Co.*, 151 Misc 2d 334; *Emmet & Co., Inc. v Catholic Health E.*, 37 Misc 3d 854.) III. Neither New York law nor the indenture has conferred upon the indenture trustee the power to bring Quadrant Structured Products Company, Ltd.'s claims. (*Navarro Savings Assn. v Lee*, 446 US 458; *Meckel v Continental Resources Co.*, 758 F2d 811.) IV. Allowing Quadrant Structured Products Company, Ltd.'s claims to proceed would not subvert the purpose of the no-action clause.

*Quinn Emanuel Urquhart & Sullivan, LLP*, New York City (*Kathleen M. Sullivan, Philippe Z. Selendy, Nicholas F. Joseph, Sean P. Baldwin* and *Alicia K. Cobb* of counsel), *Potter Anderson*

& *Corroon LLP*, Wilmington, Delaware (*Philip A. Rovner* of counsel), and *Seitz Ross Aronstam & Moritz LLP* (*Garrett B. Moritz* of counsel) for respondents. I. The parties' failure to use the particular words "the securities" does not, in and of itself, restrict coverage of a no-action clause. (*Wood v Duff-Gordon*, 222 NY 88; *Riverside S. Planning Corp. v CRP/Extell Riverside, L.P.*, 13 NY3d 398; *Matter of Westmoreland Coal Co. v Entech, Inc.*, 100 NY2d 352; *Batchelder v Council Grove Water Co.*, 131 NY 42; *Campbell v Hudson & Manhattan R.R. Co.*, 277 App Div 731; *Emmet & Co., Inc. v Catholic Health E.*, 114 AD3d 605; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d 684; *Bank of N.Y. v Battery Park City Auth.*, 251 AD2d 211; *Greene v New York United Hotels, Inc.*, 236 App Div 647, 261 NY 698; *Akanthos Capital Mgt., LLC v CompuCredit Holdings Corp.*, 677 F3d 1286.) II. The Athilon Capital Corp. no-action clause covers all claims a noteholder has based on its status as a noteholder. (*Matter of Express Indus. & Term. Corp. v New York State Dept. of Transp.*, 93 NY2d 584; *Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London*, 96 NY2d 583; *Suffolk County Water Auth. v Village of Greenport*, 21 AD3d 947; *Akanthos Capital Mgt., LLC v CompuCredit Holdings Corp.*, 677 F3d 1286; *Allan v Moline Plow Co.*, 14 F2d 912; *Beal Sav. Bank v Sommer*, 8 NY3d 318; *Roberts v Tishman Speyer Props., L.P.*, 62 AD3d 71; *Greene v New York United Hotels, Inc.*, 236 App Div 647, 261 NY 698; *ABN AMRO Bank, N.V. v MBIA Inc.*, 17 NY3d 208; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 96 AD3d 684.)

**OPINION OF THE COURT**

RIVERA, J.

In response to the first certified question from the Supreme Court of the State of Delaware, we conclude that a trust indenture's "no-action" clause that specifically precludes enforcement of contractual claims arising under the indenture, but omits reference to "the Securities," does not bar a securityholder's independent common-law or statutory claims. Accordingly, we answer the second question in the affirmative.

## I.

The Delaware litigation underlying the certified questions is a reminder of the continued effects of the 2008 financial crisis and the economic fallout associated with the utilization of complex financial instruments that mask investment risk levels (*see generally* Kristin N. Johnson, *Things Fall Apart: Regulating*

*the Credit Default Swap Commons*, 82 U Colo L Rev 167 [2011]; Brendan Sapien, *Financial Weapons of Mass Destruction: From Bucket Shops to Credit Default Swaps*, 19 S Cal Interdisc LJ 411 [2010]). Against this backdrop of high-stakes securities transactions and downward spiraling financial fortunes, the certified questions present for our consideration familiar efforts to prohibit individual lawsuits of securityholders, by the use of a contractual provision referred to as a "no-action" clause.

## II.

Quadrant Structured Products Company, Ltd. (Quadrant)[1] sued several defendants in the Delaware Court of Chancery for alleged wrongdoing related to notes purchased by Quadrant and issued by defendant Athilon Capital Corp. (Athilon),[2] a business which plaintiff alleges is now insolvent. Defendant EBF & Associates, LP (EBF) acquired Athilon in 2010, installed and now controls its Board. Like Quadrant, EBF holds certain Athilon issued securities. Defendants moved to dismiss the suit as barred by a no-action clause contained in the indenture agreement governing Quadrant's notes. The notes and indenture were a necessary part of Athilon's financing scheme, which has its roots in Athilon's initial formation. Athilon was founded in 2004 with $100 million in equity and, along with its wholly owned subsidiary Athilon Asset Acceptance Corp., sold credit derivative products in the form of "credit default swaps" which afforded credit protection for large financial institutions.[3] These credit default swaps provided that Athilon would pay the

---

**1.** Quadrant is a Cayman Islands limited liability company with its principal place of business in Connecticut.

**2.** Athilon is a Delaware corporation with its principal place of business in New York.

**3.** A credit default swap is a financial instrument that serves as "a promise by one party to pay another party in the event that a third party defaults on its debt" (Jeremy C. Kress, *Credit Default Swaps, Clearinghouses, and Systemic Risk: Why Centralized Counterparties Must Have Access to Central Bank Liquidity*, 48 Harv J on Legis 49, 52 [2011] [citation omitted]). A credit default swap contract "obligates a protection buyer to make periodic premium payments to a protection seller, who in turn must pay the buyer if one or more underlying reference entities experiences a credit event [such as default, bankruptcy or credit rating downgrade]" (*id.* [citation omitted]). Such financial instruments were viewed with skepticism and concern by some critics who feared "that a spike in interest rates could trigger a 'derivatives tsunami' that would bring all of the major banks to their knees and cause a 'blowup' in world credit markets" (Robert F. Schwartz, *Risk Distribution in*

purchaser in the case of a default on the debt that was the subject of the swap. As a risk containment measure, Athilon's operating guidelines mandated that it invest conservatively, and that when certain "suspension events" occurred, enter "runoff mode"—a period during which it could not issue new credit swaps and was required to pay off existing swaps as claims arose.

As part of its capital raising strategy, Athilon incurred debt through the issuance of a series of securities,[4] as relevant here, consisting of $350 million in senior subordinated notes, $200 million in three series of subordinated notes and $50 million in junior notes.[5] Athilon raised $600 million in capital through this debt structure. Debt subordination is common in commercial finance, and as the name of these different classes of notes implies, payment of senior subordinated notes takes priority over payment of junior notes.[6] Quadrant owns certain classes of

---

*the Capital Markets: Credit Default Swaps, Insurance and a Theory of Demarcation*, 12 Fordham J Corp & Fin L 167, 170 [2007] [citation omitted]).

  **4.**  A security is

"any note, stock, treasury stock, security future, security-based swap, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited" (15 USC § 78c [a] [10]).

  **5.**  A "note" is defined as "A written promise by one party (the *maker*) to pay money to another party (the *payee*) or to bearer" (Black's Law Dictionary [9th ed 2009]).

  **6.**  "[T]he basic concept of a subordination agreement is simple: It is the subordination of the right to receive payment of certain indebtedness . . . prior [to] payment of certain other indebtedness (the senior debt) of the same debtor. Put another way—in the circumstances specified in the subordination agreement, the senior debt must be paid in full before payment may be made on the subordinated debt and retained by the subordinating credi-

these subordinated notes, including senior subordinated notes, while EBF owns junior notes.

As part of this debt financing, Athilon entered agreements, referred to as trust indentures (indentures), with two separate Trustees, who serve as third-party administrators of the issuance of the securities.[7] An indenture is essentially a written agreement that bestows legal title of the securities in a single Trustee to protect the interests of individual investors who may be numerous or unknown to each other (*see generally* George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 250 at 280 [2d ed rev 1992]). As is typical of these agreements, the Athilon indentures set forth Athilon's obligations as the issuer of the securities, the securityholders' rights and remedies in the case of Athilon's default on the provisions of the indenture, and the duties and obligations of the Trustee (*see* Thomas Lee Hazen, The Law of Securities Regulation § 19.1 at 467 [6th ed], citing 15 USC § 77ccc [7] ["The contract, or 'indenture,' identifies the rights of all parties concerned, as well as the duties of the trustee (a third-party administrator), the obligations of the borrower, and the remedies available to the investors"]).

By 2008, Athilon had undertaken $50 billion in nominal credit default risk, far exceeding its $700 million in capital reserves, which consisted of the $100 million in equity and $600 million in security debt. Quadrant contends that at this rate a mere 0.2% loss on the collateralized debt obligations covered by Athilon's credit default swaps would strip Athilon of its equity and render it insolvent.[8] Indeed, in the aftermath of the 2008 financial crisis, in early 2009, Athilon and its subsidiary

---

tor" (Dee Martin Calligar, *Subordination Agreements*, 70 Yale LJ 376, 376 [1961]).

**7.** Deutsche Bank Trust Company serves as Trustee under the indenture governing subordinated notes, and The Bank of New York serves as Trustee pursuant to the indenture governing senior subordinated notes (*see Quadrant Structured Prods. Co., Ltd. v Vertin*, — A3d —, —, 2013 WL 5962813, *2, 2013 Del LEXIS 570, *5 [Nov. 7, 2013, No. 338, 2012]).

**8.** A collateralized debt obligation is a type of asset-backed security (*see* Neal Deckant, *X. Reforms of Collateralized Debt Obligations: Enforcement, Accounting and Regulatory Proposals*, 29 Rev Banking & Fin L 79, 80 [2009]). The underlying assets are "pooled together, split into subordinated repayment rights ('tranches'), rated by a credit rating agency and sold to investors" (*see* Neal Deckant, *Criticisms of Collateralized Debt Obligations in the Wake of the Goldman Sachs Scandal*, 30 Rev Banking & Fin L 407, 410 [2010] [citation omitted]).

sustained several suspension events and entered into runoff mode as per its operating guidelines.

In October 2011, Quadrant sued Athilon, Athilon's officers and directors, EBF, and EBF affiliate Athilon Structured Investment Advisors LLC (ASIA), asserting various counts directly and derivatively as a creditor of Athilon. Quadrant asserted claims for breaches of fiduciary duty, seeking damages and injunctive relief, and also asserted fraudulent transfer claims against EBF and ASIA. According to Quadrant, EBF acquired Athilon in 2010, and controls the Athilon Board by virtue of having installed its board members. Quadrant claimed that the Board failed to preserve Athilon's value in anticipation of liquidation in 2014 when the last credit swap was set to expire, and instead took actions in direct contravention of its duties, but which favored EBF and its affiliate. Specifically, Quadrant alleged that the EBF-controlled Board paid interest on the junior notes, notwithstanding that Athilon agreed to defer interest payments on these notes and that junior notes would not receive a return during liquidation. As a consequence, EBF received payment on its junior notes, to the detriment of senior subordinated securities, including Quadrant's subordinated notes. Quadrant also alleged the Board paid ASIA above-market-rate service fees to manage Athilon's day-to-day operations.

The Court of Chancery characterized Athilon's investment strategy as "high risk" and "contrary to the terms of Athilon's governing documents," which was designed to ensure EBF benefitted financially, regardless of the risk associated with the investment, and regardless of the status of the EBF junior notes (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 3233130, *2, 2013 Del Ch LEXIS 152, *7 [June 20, 2013, CA No. 6990-VCL]). All the while, the owners of the senior notes suffered the loss of the failed high-risk investment.[9]

Defendants moved to dismiss, asserting that Quadrant's claims were barred by a no-action clause (Athilon clause) contained in article 7, § 7.06 of the indenture governing the subordinated notes. The Athilon clause provides:

> "*Limitations on Suits by Securityholder.* No holder of any Security shall have any right by virtue or by

---

9. The Court of Chancery described a strategy "that amounts to a 'heads EBF wins, tails everyone else loses' bet. If the high-risk investments succeed, then the underwater Junior Notes and equity will benefit. If the investments fail, then the more senior tranches of Notes will bear the loss" (*Quadrant*, 2013 WL 3233130, *2, 2013 Del Ch LEXIS 152, *7).

availing of any provision of this Indenture to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Indenture, or for the appointment of a trustee, receiver, liquidator, custodian or other similar official or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default in respect of the series of Securities held by such Securityholder and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 7.08 hereof within such 60 days."

Defendants argued that the clause permitted only Trustee-initiated suits upon request of a majority of securityholders, and prohibited individual securityholder actions. In support of this argument defendants relied on *Feldbaum v McCrory Corp.* (1992 WL 119095, 1992 Del Ch LEXIS 113, 18 Del J Corp L 630 [June 1, 1992]) and *Lange v Citibank, N.A.* (2002 WL 2005728, *1, 2002 Del Ch LEXIS 101, *1-2 [Aug. 13, 2002, CA No. 19245-NC]), Delaware Court of Chancery cases applying New York law, wherein the court dismissed the respective plaintiffs' claims based on a no-action clause. The clauses at issue in those cases barred a securityholder's action "with respect to this Indenture *or the Securities* unless [specified conditions are met]" (*Feldbaum*, 1992 WL 119095 at *5, 1992 Del Ch LEXIS 113 at *17, 18 Del J Corp L at 641; *Lange*, 2002 WL 2005728 at *5, 2002 Del Ch LEXIS 101 at *16 [emphasis added]).

The Delaware Chancery Court dismissed Quadrant's complaint, citing *Feldbaum* and *Lange* (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 2012 WL 2051753, 2012 Del Ch LEXIS

300 [June 5, 2012, CA No. 6990-VCL]). On appeal to the Delaware Supreme Court, Quadrant asserted for the first time that the *Feldbaum* and *Lange* clauses were distinguishable because the clauses in those cases specifically mentioned claims arising under both the indenture *and* "the Securities," whereas the Athilon clause only applies to claims under the indenture. Therefore, the clause did not bar common-law or statutory claims arising under the securities. The Delaware Supreme Court remanded the case back to the Court of Chancery, ordering it "to issue an opinion analyzing the significance (if any) under New York law of the differences between the no-action clauses in the *Lange* and *Feldbaum* indentures and the Athilon Indenture" (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 8858605, *2, 2013 Del LEXIS 380, *5-6 [Feb. 12, 2013, No. 338, 2012]; *see* — A3d at —, 2013 WL 5962813 at *8, 2013 Del LEXIS 570 at *23).

Thereafter, the Court of Chancery issued a Report on Remand in which the court concluded that the no-action clause applies only to contractual claims arising under the indenture. After a thorough analysis of New York cases and *Feldbaum* and *Lange*, the court found the Athilon clause differed from a *Feldbaum* and *Lange*-type clause, and only extended to actions or proceedings where a securityholder claims a right by virtue or by availing of any provision of the indenture. The court, therefore, concluded that the majority of Quadrant's claims were not barred under the clause, and that dismissal was warranted with respect to two claims and partial dismissal with respect to a third because only those claims arose under the Athilon indenture.[10]

Upon receipt of the Report, the Delaware Supreme Court certified the following questions to us:

> "(1) A trust indenture no-action clause expressly precludes a security holder[,] who fails to comply with that clause's preconditions, from initiating any action or proceeding upon or under or with respect to 'this Indenture,' but makes no reference to actions or proceedings pertaining to 'the Securities.'

---

**10.** Specifically, the court identified as subject to dismissal count VII, which alleged breach of the implied covenant of good faith and fair dealing; count VIII, which alleged tortious interference with the implied covenant referenced in count VII; and part of count X, which alleged civil conspiracy relating to all other counts in Quadrant's complaint (*see Quadrant Structured Prods. Co., Ltd. v Vertin*, 2013 WL 3233130, *23, 2013 Del Ch LEXIS 152, *84-85 [June 20, 2013, CA No. 6990-VCL]).

"The question is whether, under New York law, the absence of any reference in the no-action clause to 'the Securities' precludes enforcement only of contractual claims arising under the Indenture, or whether the clause also precludes enforcement of all common law and statutory claims that security holders as a group may have.

"(2) In its Report on Remand . . . , the Court of Chancery found that the Athilon no-action clause, which refers only to 'this Indenture,' precludes enforcement only of contractual claims arising under the Indenture. The question is whether that finding is a correct application of New York law to the Athilon no-action clause" (— A3d at —, 2013 WL 5962813 at *5, 2013 Del LEXIS 570 at *14-15).

Pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR), we accepted both certified questions (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 22 NY3d 1008 [2013]).

III.

A.

█ In response to the first question, for the reasons discussed in detail below, we conclude that a no-action clause which by its language applies to rights and remedies under the provisions of the indenture agreement, but makes no mention of individual suits on the securities, does not preclude enforcement of a securityholder's independent common-law or statutory rights. We reach this conclusion based on the legal standards applicable to indenture agreements, as well as the analyses of no-action clauses in *Feldbaum* and *Lange*, and cases from New York.

A trust indenture is a contract, and under New York law "[i]nterpretation of indenture provisions is a matter of basic contract law" (*Sharon Steel Corp. v Chase Manhattan Bank, N.A.*, 691 F2d 1039, 1049 [2d Cir 1982]; *see also* Thomas Lee Hazen, The Law of Securities Regulation § 19.1 at 467 [6th ed] [referring to indenture as a contract]; *Racepoint Partners, LLC v JPMorgan Chase Bank, N.A.*, 14 NY3d 419 [2010] [same]; *AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146 [2008] [same]).

In construing a contract we look to its language, for "a written agreement that is complete, clear and unambiguous on its

face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]; *accord J. D'Addario & Co., Inc. v Embassy Indus., Inc.*, 20 NY3d 113, 118 [2012]; *Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]; *W.W.W. Assoc. v Giancontieri*, 77 NY2d 157, 162 [1990]; *Nichols v Nichols*, 306 NY 490, 496 [1954]). As the case law further establishes, we read a no-action clause to give effect to the precise words and language used, for the clause must be "strictly construed" (*Cruden v Bank of N.Y.*, 957 F2d 961, 968 [2d Cir 1992] [citation omitted]; *cf. Feldbaum*, 1992 WL 119095, *7-8, 1992 Del Ch LEXIS 113, *25, 18 Del J Corp L at 645; *Lange*, 2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *20-22; *Cruden v Bank of N.Y.*, 1990 WL 131350, *12, 1990 US Dist LEXIS 11564, *35 [SD NY, Sept. 4, 1990, Nos. 85 Civ. 4170 (JFK), 85 Civ. 4219 (JFK), 85 Civ. 4570 (JFK), 87 Civ. 5493 (JFK)]; *Victor v Riklis*, 1992 WL 122911, *6 n 7, 1992 US Dist LEXIS 7025, *20 n 7 [SD NY, May 15, 1992, No. 91 Civ. 2897 (LJF)]; *McMahan & Co. v Wherehouse Entertainment, Inc.*, 859 F Supp 743 [SD NY 1994]).

Even where there is ambiguity, if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission. The maxim *expressio unius est exclusio alterius*, as used in the interpretation of contracts, supports precisely this conclusion (*see generally* Glen Banks, New York Contract Law § 10.13 [West's NY Prac Series 2006]; *see also In re Ore Cargo, Inc.*, 544 F2d 80, 82 [2d Cir 1976] [where sophisticated drafter omits a term, *expressio unius* precludes the court from implying it from the general language of the agreement]).

Applying these well established principles of contract interpretation, and with the understanding that no-action clauses are to be construed strictly and thus read narrowly, we turn to the language of the no-action clause presented by the certified question. The no-action clause here states that no security-holder "shall have any right *by virtue or by availing of any provision of this Indenture* to institute any action or proceeding at law or in equity or in bankruptcy or otherwise *upon or under or with respect to this Indenture* . . . ." The clear and unambiguous text of this no-action clause, with its specific reference to the indenture, on its face limits the clause to the contract rights recognized by the indenture agreement itself. Further supporting this construction of the clause is the sole textual reference to securities, which is contained in the clause's provision for a

Trustee-initiated suit for a continuing "default in respect of the series of Securities."[11] This part of the no-action clause permits the trustee to sue in its name, after notice by a securityholder of a continuing default and upon approval of the suit by a majority of securityholders. Thus, the clear import of the no-action clause is to leave a securityholder free to pursue independent claims involving rights not arising from the indenture agreement.

This no-action clause, with its specific limit on the enforcement of indenture contract rights, is in contrast to no-action clauses which extend beyond the four corners of the indenture agreement to cover securities-based claims. As the cases illustrate, where the no-action clause refers to both the indenture and the securities the securityholder's claims are subject to the terms of the clause, whether those claims be contractual in nature and based on the indenture agreement, or arise from common law and statute.

Thus, in *Feldbaum*, where the no-action clause stated, in pertinent part, that "[a] Securityholder may not pursue *any remedy with respect to this Indenture or the Securities* unless [specified conditions are met]" (1992 WL 119095, *5, 1992 Del Ch LEXIS 113, *17, 18 Del J Corp L at 641), the court held that the clause barred the securityholders' fraud and breach of contract claims against the issuers of the securities (1992 WL 119095 at *2-3, 1992 Del Ch LEXIS 113 at *7-10, 18 Del J Corp L at 636-638). The court concluded that by its language the no-action clause barred not only contractual claims arising from the indenture itself, but also any claims individuals may have based on their status as securityholders (1992 WL 119095 at *7-8, 1992 Del Ch LEXIS 113 at *26-27, 18 Del J Corp L at 645).

---

**11.** Specifically, section 7.06 of the indenture provides that no action may be commenced

> "unless such holder previously shall have given to the Trustee written notice of default in respect of the series of Securities held by such Securityholder . . . , and unless also the holders of not less than 50% of the aggregate principal amount of the relevant series of Securities at the time Outstanding shall have made written request upon the Trustee to institute such action or proceedings in its own name as trustee hereunder . . . and the Trustee [after 60 days] . . . shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to [the indenture] within such 60 days . . . ."

Similarly, in *Lange*, the court dismissed plaintiffs' claims as barred by a trust indenture no-action clause that provided "[a] Securityholder may not pursue a remedy with respect to this Indenture or the Securities unless [specified conditions are met]" (2002 WL 2005728 at *5, 2002 Del Ch LEXIS 101 at *16). Plaintiffs in *Lange* were a group of securityholders who sued the issuer for having sold off its subsidiaries for an unfair value (2002 WL 2005728 at *1, 2002 Del Ch LEXIS 101 at *1-2). Plaintiffs sought to rescind the sales or disgorge the proceeds arguing, inter alia, breach of the issuer's fiduciary duty. The court applied the reasoning in *Feldbaum* to find that the no-action clause barred all claims "with respect to the Indenture or the Debentures themselves" (2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *21).

The decisions in *Feldbaum* and *Lange* relied on the language of the clause, which was broad enough to encompass conditions on enforcement of indenture and securities-based claims (*Feldbaum*, 1992 WL 119095 at *6, 1992 Del Ch LEXIS 113 at *17-18, 18 Del J Corp L at 641; *Lange*, 2002 WL 2005728 at *7, 2002 Del Ch LEXIS 101 at *20-22). Here, unlike the *Feldbaum* and *Lange* clauses, the Athilon no-action clause omits the phrase "or the Securities," indicating its coverage is limited to the indenture and rights thereunder.

Decisions from New York further support this interpretation of the words contained in the no-action clause. For example, in *General Inv. Co. v Interborough R.T. Co.* (200 App Div 794 [1st Dept 1922]), plaintiff sought to recover payment on five promissory notes. Defendant argued the no-action clause barred recovery, relying on language in the clause that provided:

> "No holder of any note hereby secured shall have any right to institute any suit, action or proceeding in equity or at law for the enforcement of this indenture, or for the execution of any trust hereof, or for the appointment of a receiver, or for any other remedy hereunder, unless such holder [meets specified requirements]" (*id.* at 796 [emphasis omitted]).

The Appellate Division held that the no-action clause did not bar plaintiff's suit because the clause applied to proceedings arising from the enforcement of the indenture and plaintiff's action "is not to affect, disturb or prejudice the lien of the

collateral indenture or to enforce any right thereunder" (*id.* at 801).[12]

In *Cruden*, plaintiffs sought to assert fraud and civil claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) against the issuer. Defendants argued a no-action clause barred their claims. The clause therein provided:

> "No holder of any Debenture shall have any right by virtue of or by availing himself of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder . . . ." (1990 WL 131350, *12, 1990 US Dist LEXIS 11564, *35-36.)

Although reversing in part, the Second Circuit agreed with the District Court's conclusion that plaintiffs' fraud and RICO claims were not made under the indenture and, thus, could not be barred by the no-action clause (*Cruden*, 957 F2d at 968).[13]

In contrast, in *Victor*, the District Court dismissed plaintiff's RICO claims as barred by a no-action clause (1992 WL 122911 at *1, 1992 US Dist LEXIS 7025 at *2). The clause at issue, similar to the clause in *Feldbaum*, prohibited "any remedy with respect to [the] Indenture or the Securities" unless specified conditions were met (1992 WL 122911 at *6, 1992 US Dist LEXIS 7025 at *19 [emphasis omitted]). The District Court distinguished the clause from the no-action clause in *Cruden* because the former was "not as broad as the one [here]" (1992 WL 122911, *6 n 7, 1992 US Dist LEXIS 7025, *20 n 7).

In *McMahan*, a no-action clause barred actions seeking "any remedy with respect to [the] Indenture or the Securities" (859 F Supp at 747). Plaintiffs brought federal securities claims arguing, inter alia, that they were entitled to immediate tender of their securities as a consequence of the issuer's merger with two other entities. The District Court held federal securities laws preclude application of a no-action clause to plaintiffs' federal securities claims, allowing those claims to proceed, but

---

**12.** This Court affirmed without discussion of the no-action clause (*see General Inv. Co. v Interborough R.T. Co.*, 235 NY 133 [1923]).

**13.** The Second Circuit reversed the District Court's ruling that some of plaintiffs' claims against the Trustees were time-barred (*Cruden*, 957 F2d at 978).

concluded the state law claims were properly barred by the no-action clause (*id.* at 749).[14]

As these cases illustrate, a no-action clause, like the Athilon clause, that refers only to actions under the indenture, is limited by its language to indenture-based contract claims. However, a no-action clause similar to the clauses in *Feldbaum* and *Lange*, that refers specifically to claims and remedies arising under the indenture and the securities, applies to all claims, except those excluded from coverage as a matter of law. Here, the Athilon no-action clause when strictly construed and afforded its plain meaning, makes no reference to the securities, and therefore does not apply to claims arising outside the scope of the indenture. Accordingly, we agree with the Delaware Chancery Court's Report on Remand that *Feldbaum* and *Lange* are distinguishable, and the Athilon no-action clause applies only to contract claims under the indenture, not to Quadrant's common-law and statutory claims.

Defendants argue that under New York law, what matters is the parties' intent, not any "legal talismans," and that the parties' intent was for the no-action clause to apply to all individual securityholder suits. This is no argument at all, for under our law where the language of the contract is clear we rely on the terms of the document to give effect to the parties' intent (*see J. D'Addario & Co.*, 20 NY3d at 118; *Vermont Teddy Bear Co.*, 1 NY3d at 475; *Nichols*, 306 NY at 496). As we have discussed, the no-action clause is clear on its face and applies to indenture contract claims only. The New York cases upon which defendants rely fail to persuade us otherwise, for they involve rights under the indenture, or securityholder rights which a no-action clause may not abridge as a matter of law (*see e.g. Greene v New York United Hotels, Inc.*, 236 App Div 647, 648 [1st Dept 1932] [petition for receivership dismissed as defective; debentureholder failed to plead compliance with no-action clause for claims of past-due payment]; *Emmet & Co., Inc. v Catholic Health E.*, 37 Misc 3d 854, 856 [Sup Ct, NY County 2012] [claim arising under indenture]; *Walnut Place LLC v Countrywide Home Loans, Inc.*, 35 Misc 3d 1207[A], 2012 NY Slip Op 50601[U] [Sup Ct, NY County 2012] [claim against Trustee]). The reasoning in these cases provides no basis to alter our

---

**14.** The Second Circuit affirmed, but remanded back to the District Court for a recalculation of damages under the Securities Act of 1933 (*McMahan & Co. v Wherehouse Entertainment, Inc.*, 65 F3d 1044, 1051 [2d Cir 1995]).

conclusion that a no-action clause that omits language specifically referencing the securities does not extend to a securityholder's common-law and statutory claims.

Nevertheless, defendants argue that, regardless of the actual words used, the language of the no-action clause includes all securityholder actions. Defendants essentially argue that references to the indenture should be interpreted to include the securities, and that to do otherwise will upset the parties' expectations. These arguments are unsupported by the no-action clause itself.

In support of their argument that indenture also means securities, defendants point to the purpose of the no-action clause, which they argue is to prevent unpopular duplicative suits, by channeling all securityholder claims through the Trustee. They contend that a no-action clause prohibits what they call the "lone ranger" lawsuit: individuals asserting claims that foster the interests of minority securityholders at the potential expense of the majority's interest. Quadrant's suit, defendants argue, is exactly the type of litigation the no-action clause is intended to prevent. Given this understanding of the intent of the no-action clause, the omission of the words "the Securities" is logical because they would be superfluous, adding nothing to the already expansive coverage of the clause.

Defendants are correct that generally a no-action clause prevents minority securityholders from pursuing litigation against the issuer, in favor of a single action initiated by a Trustee upon request of a majority of the securityholders (see American Bar Foundation, Commentaries on Indentures § 5.7 at 232 [1971] [discussing proposed no-action clause in model indenture, finding "(t)he major purpose of this (proposed no-action clause) is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets"]).

As the court in *Feldbaum* noted, limitations on individual securityholder suits serve the primary purpose of a no-action clause, which is "to protect issuers from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors" (1992 WL 119095 at *6, 1992 Del Ch LEXIS 113 at *20, 18 Del J Corp L at 642). These limitations further "protect[ ] against the risk of strike suits" (*id.*). Indeed, a no-action

clause "make[s] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders" (1992 WL 119095, *5, 1992 Del Ch LEXIS 113, *19, 18 Del J Corp L at 642). The no-action clause achieves these goals

> "by delegating the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by delegating to the trustee the right to prosecute such a suit in the first instance. These clauses also ensure that the proceeds of any litigation actually prosecuted will be shared ratably by all bondholders" (1992 WL 119095 at *6, 1992 Del Ch LEXIS 113 at *21, 18 Del J Corp L at 643 [citation omitted]).

However, even defendants admit that the Athilon clause is not a complete bar to any and all securityholder suits. There are claims which, by law, cannot be prohibited by a no-action clause, most notably claims against the trustee (*see e.g.* 15 USC § 77*ooo* [d] ["The indenture . . . shall not contain any provisions relieving the indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct"]; *see also Cruden,* 957 F2d at 968 [no-action clause will not bar securityholder suit against Trustee because "it would be absurd to require the debenture holders to ask the Trustee to sue itself"]).

Defendants appear to argue that the enactment of the Trust Indenture Act of 1939 (TIA) eliminated the need to reference the securities in a no-action clause because the TIA prohibits the clause from barring a securityholder's action against the Trustee for breach of duties recognized by the TIA, or for past-due interest or principal on the securities (*see* 15 USC § 77ppp [b]). Of course, as Quadrant's case illustrates, a securityholder may have claims apart from claims against the Trustee, or for past-due payments. Moreover, as long as the indenture does not violate or conflict with the TIA, the parties may structure the indenture agreement to address their respective interests and obligations, including placing limits on certain claims of right.

Most significant here is that the no-action clause, by its own terms, is concerned with minority holders' actions in the case of a default by the issuer of the securities. The no-action clause requires a written request for the Trustee to commence an action or proceeding *regarding a default* with respect to the series of securities held by the noteholder and approval by a majority

of securityholders.[15] Logically then, the no-action clause applies when the Trustee is authorized to decide whether to act; it cannot serve as an outright prohibition on a suit filed by a securityholder in the case where the Trustee is without authorization to act. Otherwise, the purpose of the no-action clause—to avoid duplicative suits and protect the majority interests by mandating that actions be channeled through the Trustee—would be subverted (*Feldbaum*, 1992 WL 119095 at *6, 1992 Del Ch LEXIS 113 at *19, 18 Del J Corp L at 642). This is what the parties intended. Of course, they were free to not limit the no-action clause in this way. Here, therefore, the purpose of the Athilon no-action clause is not frustrated where the Trustee is without authority to act.

Defendants' argument that interpreting the no-action clause to exclude certain claims would upset the contracting parties' expectations is unpersuasive. The indenture itself defines "indenture" and "securities" separately, recognizing them as distinct.[16] Therefore, defendants' functional equivalency argument is merely another version of the argument we have already rejected on the law: that the parties intended other than what the words in the document mean. As our law makes clear, we rely on the unambiguous terms of the agreement when construing contract provisions like the indenture no-action clause (*see J. D'Addario & Co.*, 20 NY3d at 118; *Vermont Teddy Bear Co.*, 1 NY3d at 475; *Nichols*, 306 NY at 496). Quadrant's claims are based not on the indenture agreement—under which the Trustee administers the debt issuance by Athilon—but rather arise from Quadrant's status as a securityholder. The parties could not have expected otherwise, given the plain language of the clause. If the parties sought to prohibit these types of suits, they were free to include them within the Athilon no-action clause.

We also note that in 2000, the Ad Hoc Committee for Revision of the 1983 Model Simplified Indenture produced a model no-action clause which provides "[a] Securityholder may pursue a remedy with respect to this Indenture or the Securities only if

---

**15.** The requirement of notice to the Trustee and majority securityholder approval makes sense because litigation by a minority securityholder upon a default is an attempt to secure payment, and resolution of the matter is of interest to the entire class of securityholders.

**16.** Section 1.01 defines "Indenture" as "this instrument as originally executed," and "Securities" as the "Series A Notes and the Series B Notes," i.e., the notes purchased by plaintiff securityholder.

[the holder complies with the terms of the clause]" (55 Bus Law 1115, 1137-1138 [2000]). By its terms, the no-action clause references the indenture and the securities. Even this broad model clause is not without limits. In its commentary to this provision, the Committee states: "[t]he clause applies, however, only to suits brought to enforce contract rights under the Indenture or the Securities, not to suits asserting rights arising under other laws" (*id.* at 1191). The Committee intended the model no-action clause to limit only contract rights, not to encompass all securityholder suits. We express no opinion on whether no-action clauses should be so narrowly construed, but note only that parties sophisticated and well versed in this area of the law—like the parties here—are well aware of these commentaries and, thus, we find unsupportable defendants' argument that a construction of the no-action clause that permits Quadrant's claims to proceed would be unsettling to the parties' expectations.

## B.

The second certified question asks whether the Vice Chancellor's Report on Remand correctly interpreted New York law. We answer this question in the affirmative. In its complaint, Quadrant asserts individual and derivative claims seeking damages and injunctive relief for breaches of fiduciary duty, fraudulent transfer, breach of covenant of good faith and fair dealing, intentional interference with contractual relations, and conspiracy. Essentially, Quadrant claims that Athilon's Board, installed and controlled by EBF, acted pursuant to a scheme which ensures that the junior securityholders are paid, despite their inferior status vis-à-vis Quadrant's senior notes, and, as a consequence, payment of the junior securities imperils payment of the senior securities. As described by Quadrant, Athilon's actions are an effort to siphon off as much capital as possible, as quickly as possible, for the benefit of EBF. Thus understood, the Trustee cannot address these claims because the Trustee's duties, as per the indenture, are only triggered upon an event of default—exactly what Quadrant seeks to avoid, at least with respect to the senior securities.

Accordingly, the Vice Chancellor correctly concluded that, with the exception of two claims and part of a third, the no-action clause did not bar plaintiff's action. The claims the Vice Chancellor found viable are those that the Trustee cannot assert, as they are not based on any default on the securities.

Specifically, the Vice Chancellor correctly found that those claims sounding in breach of contract and arising from the indenture are barred—requiring the majority securityholders to bring those actions through the Trustee.

## IV.

Accordingly, the certified questions should be answered in accordance with this opinion.

Chief Judge LIPPMAN and Judges GRAFFEO, READ, SMITH, PIGOTT and ABDUS-SALAAM concur.

Following certification of questions by the Supreme Court of the State of Delaware and acceptance of the questions by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in accordance with the opinion herein.