Mulacek v ExxonMobil Corp. (2023 NY Slip Op 02829)

Mulacek v ExxonMobil Corp.

2023 NY Slip Op 02829

Decided on May 25, 2023

Appellate Division, First Department

OING, J. 

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered: May 25, 2023
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Cynthia S. Kern
Ellen Gesmer Jeffrey K. Oing Saliann Scarpulla Julio Rodriguez III

Index No. 655333/21 Appeal No. 17156 Case No. 2022-04267 

[*1]Philippe E. Mulacek, et al., Plaintiffs-Appellants,
v
ExxonMobil Corporation, et al., Defendants-Respondents.

Plaintiffs appeal from an order of the Supreme Court, New York County (Barry R. Ostrager, J.), entered September 13, 2022, which granted defendants' motion to dismiss the complaint.

Boise, Schiller & Flexner, New York (Michael M. Fay, Chris L. Sprengle and Jenny H. Kim of counsel), for appellants.
Davis Polk & Wardwell LLP, New York (Andrew Ditchfield, Lindsay Schare and Sean Stefanik of counsel), for respondents.

OING, J. 

This appeal arises out of defendants ExxonMobil Corporation and ExxonMobil Holdings' acquisition of InterOil Corporation, a publicly traded oil and gas company incorporated in the Canadian territory of Yukon, whose primary assets consist of oil and gas exploration and development rights. Exxon acquired InterOil for $45 per share, payable in Exxon stock, plus a future second payment known as the contingent resource payment (CRP), which would be calculated pursuant to an agreed upon valuation formula. During the relevant period, plaintiffs Philippe E. Mulacek, Five Sterling LP, The Sterling Mulacek Trust, Petroleum Independent & Exploration LLC, and Gerard Rene Jacquin were InterOil shareholders. Under the law of Yukon, the acquisition required the Yukon courts to determine whether the transaction was "fair and reasonable" after it was approved by a shareholder vote. Plaintiff Mulacek initially challenged the fairness of the transaction, claiming that InterOil's disclosures to shareholders concerning the value of its assets were inadequate and that the valuation formula to calculate the CRP prevented shareholders from maximizing InterOil's future value.
The Yukon Supreme Court rejected the challenge and approved the transaction. On appeal, the Yukon Court of Appeal reversed, ruling that the lower court had erred in finding the transaction fair and reasonable because the information provided to InterOil's shareholders was deficient. Thereafter, Exxon and InterOil revised the transaction and entered into an amended transaction, wherein, amongst other amendments, they increased the total potential value of the CRP by modifying its valuation formula.
On January 13, 2017, InterOil issued to its shareholders a new information circular of over 300 pages, soliciting proxies in favor of the newly amended transaction, and including information about a CRP agreement to be executed in connection with the closing of its acquisition by Exxon. This agreement would establish the process for distributing the CRP to InterOil shareholders, as well as the process for resolving any disputes concerning those payments. Under the CRP agreement, InterOil shareholders, such as plaintiffs, became "Holders" of escrow verification receipts (EVR) evincing their right to obtain a CRP. The CRP agreement also established a committee composed of two former InterOil directors (the Holder Committee) to act as agent for the Holders with respect to rights created by the agreement. By accepting an EVR, each Holder consented to the establishment of that Holder [*2]Committee and its membership. The CRP agreement also provided that only the Required Holders, defined as "Holders of more than 25% of the outstanding EVRs," or the Holder Committee, with Required Holder approval, could initiate any action with respect to the CRP agreement. The information circular explained to InterOil shareholders that they could exercise their dissenting rights and request that a Yukon court determine the fair value of their shares.
On February 14, 2017, InterOil shareholders overwhelmingly approved the amended transaction, but there were still legal challenges to it. After one such challenge, the Yukon Supreme Court held that that the transaction was not "fair and reasonable." Plaintiff Mulacek was not among the dissenting InterOil shareholders in this second lawsuit. On February 7, 2020, on appeal, the Yukon Court of Appeal reversed the lower court. In doing so, the Court observed, among other things, that plaintiff Mulacek, "who had to objected to the first Exxon transaction, endorsed the second Exxon transaction and did not exercise dissent rights," and that "no better deal was available to shareholders."
Rather than avail themselves of their dissent rights under the amended transaction, plaintiffs, alleging that they "are express beneficiaries of the CRP" agreement and "have standing to bring this action under the Agreement," challenged the CRP and its valuation formula by commencing this action against Exxon some four years later, asserting a single cause of action for breach of § 6.02 of the CRP agreement. They allege that "Exxon wanted, and acted, to buy InterOil on the cheap" by implementing a valuation formula detrimental to InterOil shareholders like them. They seek damages in excess of $220 million.
Exxon moved pursuant to CPLR 3211 to dismiss the complaint on three separate bases: (1) that plaintiffs lack standing to bring this action because the CRP agreement § 8.05's "no-action" clause bars individual shareholders and small ad hoc groups of shareholders, like plaintiffs, from instituting any action or proceeding to enforce the CRP agreement; (ii) that plaintiffs failed to pursue their § 6.02 claim in accordance with the mandatory dispute resolution process set forth in CRP agreement § 3.05(d); and (iii) that plaintiffs failed to plead a cognizable claim. In opposition, plaintiffs argued that § 8.05 was only a "no-class action" clause and, as such, did not bar them from bringing a non-class suit seeking redress for a § 6.02 breach; that their § 6.02 claim did not come withing the ambit of § 3.05(d)'s dispute resolution process; and that their pleading sufficiently stated a cause of action.
Supreme Court granted Exxon's pre-answer motion to dismiss. The court noted that plaintiffs failed to dissent with respect to any aspect of the 2017 amended transaction until this action was filed in September 2021, after other dissenting shareholders were unsuccessful in challenging the amended transaction. The court then held [*3]that § 8.05 of the CRP agreement unambiguously provided that only Required Holders or the Holder Committee (with Required Holder approval) could initiate an action or proceeding to enforce or challenge the CRP agreement, and that plaintiffs' failure to allege that they were either Required Holders or members of the Holder Committee meant they lacked standing to "pursue the claims they have asserted in their Complaint." Additionally, Supreme Court held that the "non-judicial dispute resolution procedures" set forth in § 3.05(d) provided "an additional and independent reason to dismiss the Complaint." On appeal, plaintiffs argue that Supreme Court erred in finding that §§ 3.05(d) and 8.05 of the CRP agreement bar them from pursuing their § 6.02 claim.
Article 3 of the CRP agreement, entitled "EVRs and Contingent Resource Payments," sets out the procedure for paying a CRP to EVR holders. Section 3.05(d) details the payment disputes that fall within its ambit and establishes exclusive procedures for the nonjudicial resolution of these disputes. Such an alternative dispute resolution procedure — if applicable — bars resort to any other forum (see JCH Delta Contr., Inc. v City of New York, 44 AD3d 403, 404 [1st Dept 2007]). For the reasons that follow, whether this procedure is mandatory or permissive is not material. The dispositive language set forth in § 3.05(d) states in relevant part:
"If the Required Holder disputes either (x) . . . or (y) . . . the Required Holder may provide [Exxon] . . . with written notice . . . of such dispute . . . provided that the volume of PRL 15 2C Resources as determined by the Interim Resource Certification pursuant to the Total Sale Agreement shall be final, binding and conclusive upon the Holders and the Required Holders and shall not qualify as a Dispute Matter and shall not be, directly or indirectly, subject to review, challenge, dispute or adjustment pursuant to this Section 3.05(d) (it being understood that this proviso shall not prevent or restrict the Holders from asserting or disputing whether [Exxon] has complied with its express obligations under Section 6.02)."
(emphasis added).
Although plaintiffs do not dispute that only Required Holders may challenge the Interim Resource Certification, they contend that the parenthetical accomplishes two purposes: preserving their right to dispute whether Exxon has complied with § 6.02 and permitting them to pursue the claim outside of the § 3.05 alternative dispute resolution process. Exxon argues, however, that the parenthetical is not a carve-out, but instead, merely confirms "that any challenges to Exxon's compliance with Section 6.02 would still be subject to the dispute-resolution procedures therein."
We agree with the dissent that § 3.05(d) does not prevent or restrict plaintiffs, as Holders, from asserting or disputing whether Exxon has complied with its § 6.02 obligations outside of the dispute resolution process. Section 3.05(d) is clear — only "Required [*4]Holders" can pursue specifically identified disputes, none of which are at issue here, through the dispute resolution process, except for a § 6.02 dispute. We would add that Exxon's interpretation that the parenthetical is not a carve-out, but merely a confirmation of § 3.05(d)'s scope, is not tenable. As already noted, there would be no reason to single out § 6.02 within § 3.05(d) unless there was some basis for doing so. Exxon's reading would render meaningless the clear and unambiguous language of the parenthetical because it would result in preventing or restricting the Holders from asserting or disputing a § 6.02 claim given that only Required Holders may use § 3.05's dispute resolution process (see Two Guys from Harrison-N.Y., Inc. v S.F.R. Realty Assoc., 63 NY2d 396, 403 [1984] [courts should not interpret a contract in a way that would render contractual clauses meaningless]). Accordingly, the complaint should not have been dismissed based on § 3.05(d) because the carve-out permits § 6.02 claims to be brought outside of the dispute resolution process.
CRP agreement § 3.05(d) clearly demonstrates that Exxon contemplated a nonjudicial manner in which to address certain disputes. Although § 3.05(d) provides for a § 6.02 carve-out from the dispute resolution process, the question that remains is whether the CRP agreement contemplates how to address this carve-out and other non-§ 3.05(d) challenges to it. To answer this question, we turn to CRP agreement § 8.05, a limitations on suit clause, entitled "Benefits of Agreement; Action by Required Holders," which provides, in relevant part:
"Except as set forth in Section 4.02(g) [Exxon's indemnification of the Escrow Agent], nothing in this Agreement, express or implied, will give to any Person (other than Parent, [Exxon] . . . the Holders, [and] the Holder Committee . . .) any benefit or any legal or equitable right, remedy or claim under this Agreement or under any covenant or provision herein contained, all such covenants and provisions being for the sole benefit of Parent, [Exxon] . . . the Holders, [and] the Holder Committee. . . . The Holders and the Holder Committee will have no rights hereunder except as are expressly set forth herein. Notwithstanding anything to the contrary in this Agreement, only the Required Holders or the Holder Committee (with Required Holder approval) will have the right, on behalf of all Holders, by virtue of or under any provision of this Agreement, to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Agreement, and no individual Holder or other group of Holders will be entitled to exercise such rights. Subject to the preceding sentence, all representations and covenants of [Exxon] . . . set forth herein relating to the Holders are in favor of and for the benefit of the Holders."
Section 8.05's use of the words "this Agreement" means that all disputes or challenges to the CRP agreement, which [*5]include § 6.02, come within that section's ambit (see e.g. Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 562 [no-action clause indicates that "its coverage is limited to the indenture and rights thereunder"]). The wording of § 8.05 also demonstrates that it sets out the exclusive procedure as to how disputes and challenges to the CRP agreement that fall outside of § 3.05(d)'s scope, which includes § 6.02 claims, are to be handled. Specifically, it bestows only on the Required Holders or the Holder Committee (with Required Holder approval) "the right, on behalf of all Holders, by virtue of or under any provision of this Agreement, to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Agreement." Clearly, this provision is meant to provide only the named parties with the right to commence a class action concerning the CRP agreement, which includes § 6.02 disputes.
Plaintiffs do not dispute that they cannot pursue their § 6.02 claim as a class action because they are neither Required Holders or members of the Holder Committee.[FN1] Instead, plaintiffs contend that § 8.05 should be read narrowly to restrict them only from bringing a class action, and not be interpreted to limit their ability as Holders from pursuing a § 6.02 claim in a non-class action setting. They buttress this argument by pointing to § 3.05(d)'s carve-out for § 6.02 disputes, which ostensibly enables them to assert a § 6.02 claim, and to § 8.05's language that "all representations and covenants of [Exxon] . . . set forth herein relating to the Holders are in favor of and for the benefit of the Holders."
We note that the dissent disagrees with plaintiffs' definitive interpretation, noting that the § 8.05 lawsuit limitations must be strictly construed and finding "that it is, at best, ambiguous as to whether the [Required Holders or the Holder Committee] are the only party that may initiate putative class actions in connection with claims of breach of the agreement or whether they are the only party that may challenge the agreement at all." The dissent's reasoning focuses on the inclusion of the words "on behalf of all Holders," which the dissent believes "strongly indicates that Section 8.05 was intended as a limitation only on who may bring class actions 'on behalf of all Holders,' not on who may institute any claim at all." The dissent further reasons that, "Section 8.05 could easily have been drafted with standard language frequently used in such contracts to provide that only the Required Holders or the Holder Committee were authorized to pursue 'any remedy with respect to'" CRP agreement. We disagree with plaintiffs' reading of § 8.05 and its interplay with § 3.05(d), and respectfully disagree with the dissent's view that the section is ambiguous.
Plaintiffs' construction overlooks the fact that § 8.05 has a dual purpose — no-class action and no action. We discern no legal impediment to having [*6]a lawsuit limitations clause restricted to only a single purpose, rather than multiple purposes. The Court of Appeals has recognized the utility of limitation clauses:
"Defendants are correct that generally a no-action cause prevents minority securityholders from pursuing litigation against the issuer, in favor of single action initiated by a Trustee upon request of a majority of the securityholders. . . . [L]imitations on individual securityholder suits serve the primary purpose of a no-action clause, which is 'to protect issuers from the expense involved in defending [individual] lawsuits that are either frivolous or otherwise not in the economic interest of the corporation and its creditors'. . . . These limitations further 'protect[] against the risk of strike suits'. . . . Indeed, a no-action clause 'make[s] it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders'. . . . The no-action clause achieves these goals."
(Quadrant Structured Prods., 23 NY3d at 565-566). This recognition is precisely why the Court held that a reading of a no-action clause must give effect to the precise words and language used, and the clause must be strictly construed (id. at 560). Where, as here, the language of the contract is clear, the terms of the document evince the parties' intent (see Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004]). No particular talismanic words are required to draft an effective no-action clause. Simply put, all that is required is for the clause to be complete, clear, and unambiguous on its face and enforced according to the plain meaning of its terms (see Greenfield v Philles Records, 98 NY2d 562, 569 [2002]).
Critically, § 8.05's penultimate sentence not only provides that plaintiffs cannot bring a class action to challenge any aspect of the CRP agreement, but it also bars them from bringing any action or proceeding altogether, "[n]otwithstanding anything to the contrary in this Agreement . . . no individual Holder or other group of Holders will be entitled to exercise such rights." Such "rights," written in the plural as opposed to in the singular, refer to those set out in the beginning of the sentence — namely, "institut[ing] any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Agreement." We cannot help but note that the named authorized parties in § 8.05's suit limitation clause is not inflexible. Only Required Holders or the Holder Committee (with Required Holder approval) have the right to bring an action to enforce the terms of the CRP agreement. Although the Holder Committee occupies a place under the agreement, the agreement makes clear that Required Holders have controlling authority. Had plaintiffs wished to pursue their § 6.02 claim under § 8.05, they could have achieved Required Holder status by acquiring more than 25% of the EVRs, or could have garnered the support of enough other Holders [*7]to pursue their claim. They did not. Under these circumstances, Supreme Court correctly found that § 8.05 bars plaintiffs from asserting a § 6.02 claim against Exxon (see Nomura Home Equity Loan, Inc., Series 2006-FM2 v Nomura Credit & Capital, Inc., 30 NY3d 572, 581 [2017] [a contract should be read as a fully integrated whole, with no provision rendered meaningless]).[FN2]
We decline to address whether the complaint's allegations state a cause of action for breach of § 6.02 of the CRP agreement in light of our determination.
Accordingly, the order of the Supreme Court, New York County (Barry R. Ostrager, J.), entered September 13, 2022, which granted defendants' motion to dismiss the complaint should be affirmed, with costs.
All concur except Gesmer and Rodriguez, JJ.
who dissent in a separate Opinion by Gesmer, J.

Gesmer, J. (dissenting)
 

I disagree with my colleagues in the majority that the relevant contractual provisions at issue here "unambiguously" deprive plaintiff shareholders of standing to assert their claim for breach of contract. Rather, I would find that the relevant clauses are ambiguous and therefore cannot be found, at this stage of the litigation, to deprive plaintiffs of their common-law right to sue. Accordingly, I respectfully dissent and would reverse the motion court's holding.
Plaintiffs are former shareholders of a company that was acquired by defendants. Plaintiffs seek damages for alleged breach of the Contingent Resource Payment Agreement (CRPA) that defined a future payment that they would receive for their share, which would be calculated pursuant to an agreed upon valuation formula. Specifically, plaintiffs allege that defendants breached their obligation under CRPA Section 6.02 to properly appraise the company's interest in natural gas reserves, with the result that they failed to make the proper payment to plaintiffs. The motion court granted defendants' motion to dismiss the complaint, finding that plaintiffs lacked standing to bring this action under CRPA Section 8.05, which provides:
"Notwithstanding anything to the contrary in this Agreement, only the Required Holders [FN3] or the Holder Committee (with Required Holder approval) will have the right, on behalf of all Holders, by virtue of or under any provision of this Agreement, to institute any action or proceeding at law or in equity or in bankruptcy or otherwise upon or under or with respect to this Agreement, and no individual Holder or other group of Holders will be entitled to exercise such rights."[FN4]
Defendants argue that this is a "no-action" clause, which bars individual shareholders or small groups of shareholders from instituting any action or proceeding to enforce the CRPA. Plaintiffs argue that Section 8.05 only limits who may bring putative class actions "on behalf of all Holders." In my view, Section 8.05 is, at best, ambiguous as to which interpretation reflects the parties' intent, and the motion court therefore erred in dismissing the petition [*8]on the basis that Section 8.05 deprives plaintiffs of standing to commence this action.
Courts must "read a no-action clause to give effect to the precise words and language used, for the clause must be strictly construed . . . . [W]here there is ambiguity, if parties to a contract omit terms—particularly, terms that are readily found in other, similar contracts—the inescapable conclusion is that the parties intended the omission" (Quadrant Structured Prods. Co., Ltd. v Vertin, 23 NY3d 549, 560 [2014] [internal quotation marks omitted]). I understand that "no-action" clauses are generally used to deter minority shareholders from commencing numerous and potentially frivolous lawsuits by providing for a single action benefitting the interests of a majority of shareholders (see id. at 565). However, we are required to construe such clauses "strictly," to read them "narrowly," and to give effect only to plain and unambiguous language contained in them (id. at 560).
Here, the omission of standard "no-action" clause language and the inclusion of the words "on behalf of all Holders" strongly indicates that Section 8.05 was intended as a limitation only on who may bring class actions "on behalf of all Holders," rather than a restriction on who may institute any claim at all. Indeed, Section 8.05 could easily have been drafted with standard language frequently used in such contracts to provide that only the Required Holders or the Holder Committee were authorized to pursue "any remedy with respect to" the CRPA (see Quadrant Structured Prods., 23 NY3d at 563). The inclusion of the words "on behalf of all holders" requires us to strictly construe that provision (see id. at 564).
Moreover, waiver of a fundamental contract right must be "knowing[], voluntar[y] and intentional[]. . . . , should not be lightly presumed and must be based on a clear manifestation of an intent" (Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d 96, 104 [2006] [internal quotation marks omitted]). As written, Section 8.05 does not constitute an unambiguous waiver by "Holders," like plaintiffs, of their applicable fundamental, common-law right to bring (as direct or third-party contractual beneficiaries), individual claims on their own behalf.
Construing the language of Section 8.05 strictly, as we must (see Quadrant Structured Prods., 23 NY3d at 560), I would find that it is, at best, ambiguous as to whether the representatives are the only party that may initiate putative class actions in connection with claims of breach of the agreement or whether they are the only party that may challenge the agreement at all. Accordingly, I would reverse the granting of defendants' motion to dismiss on that basis.
Furthermore, I would also find that Section 3.05(d) does not apply here to restrict plaintiffs to alternative dispute resolution procedures to raise their claims. Section 3.05(d) expressly applies exclusively to the Required Holders and entitles them [*9]to use the ADR process for the limited purpose of asserting specified claims not at issue here. It does not apply to claims by Holders such as plaintiffs, since it states, among other things, that the provision "shall not prevent or restrict the Holders from asserting or disputing," as plaintiffs do here, "whether [defendant Exxon] has complied with its express obligations under Section 6.02."
Order, Supreme Court, New York County (Barry R. Ostrager, J.), entered September 13, 2022, affirmed, with costs.
All concur except Gesmer and Rodriguez, JJ. who dissent in an Opinion by Gesmer J.
Kern, J.P., Gesmer, Oing, Scarpulla, Rodriguez III, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: May 25, 2023

Footnotes

Footnote 1: We reject plaintiffs' assertion that this no-class action provision violates the class action prerequisites of CPLR 901 and Fed R Civ P 23 as the provision is not, in fact, facially violative of either procedural rule. In any event, the challenge is premature given that nothing in the record demonstrates that the provision as applied would violate either rule.

Footnote 2: Plaintiffs make one last argument in an effort to reverse Supreme Court's dismissal of their complaint, oddly in a footnote to their § 8.05 argument. They merely remark that Supreme Court in dismissing their complaint incorrectly "assumed that individual Holders waived their fundamental, common law right to sue for breach of the CRP Agreement [under § 8.05]." Other than making this conclusory statement and citing settled legal principles for waiver, we are unable to discern what plaintiffs' argument is without further elucidation. In fact, Exxon never argued that plaintiffs waived their right to sue under § 8.05, but instead argued that § 8.05 limitations could be imposed on them as beneficiaries. The absence of any factual recitations and arguments, legal or otherwise, prevents a meaningful review of the merits of plaintiffs' contention. Under these circumstances, we decline to address it.

Footnote 3: The CRPA defines "Required Holders" as the record Holder or Holders of more than 25% of escrow verification receipts.

Footnote 4: The majority reads the phrase "such rights" to refer to the institution of "any action or proceeding." In my view, it could just as easily refer to the institution of class actions brought "on behalf of all Holders," a phrase the majority omits in making this argument. This lack of clarity in Section 8.05 underscores its ambiguity.