[996 NYS2d 476]

CORTLANDT STREET RECOVERY CORP., Plaintiff, v HELLAS TELE-COMMUNICATIONS, S.À.R.L., et al., Defendants.

CORTLANDT STREET RECOVERY CORP. et al., Plaintiffs, v DAVID BONDERMAN et al., Defendants.

WILMINGTON TRUST COMPANY, as Trustee, et al., Plaintiffs, v HELLAS TELECOMMUNICATIONS FINANCE, S.C.A., et al., Defendants.

CORTLANDT STREET RECOVERY CORP., Plaintiff, v HELLAS TELE-COMMUNICATIONS II, S.C.A., et al., Defendants.

Supreme Court, New York County, September 16, 2014

**APPEARANCES OF COUNSEL**

*White & Case LLP*, New York City (*Dwight A. Healy* of counsel), for Hellas Telecommunications, S.à.r.l., and others, defendants in the first, third and fourth above-entitled actions.

*Ropes & Gray LLP*, New York City (*Robert S. Fischler* of counsel), for Apax Partners, LLP, defendant in the first above-entitled action.

*Kasowitz, Benson Torres & Friedman LLP*, New York City (*Paul M. O'Connor III* of counsel), for TPG Capital, L.P., defendant in the first above-entitled action.

*Mandel & Mandel LLP*, Miami, Florida (*David S. Mandel* of counsel), and *Stamell & Schager LLP*, New York City (*Jared B. Stamell* of counsel), for Cortlandt Street Recovery Corp., plaintiff in the first, second, third and fourth above-entitled actions.

*Foley & Lardner LLP*, New York City (*Douglas E. Spelfogel* of counsel), for Wilmington Trust Company, plaintiff in the second and third above-entitled actions.

## OPINION OF THE COURT

MARCY S. FRIEDMAN, J.

These four related actions seek payment of principal and interest on notes issued in public offerings. Three of the actions were brought to recover on payment in kind notes (PIK notes or notes). Plaintiffs in these actions are Cortlandt Street Recovery Corp., an assignee for collection, and/or Wilmington Trust Co. (WTC), the indenture trustee. The fourth action was brought by Cortlandt to recover on subordinated notes (sub notes or notes). All of the actions allege that the Hellas entities which issued and guaranteed the notes transferred the proceeds of the notes by means of fraudulent conveyances to the Apax Partners, LLP/TPG Capital, L.P. defendants and their principals. Defendants move, pursuant to CPLR 3211, to dismiss the actions.

The first of the PIK note actions (index No. 651693/10) (*Cortlandt I*) was commenced solely by Cortlandt, suing as "the assignee and agent for collection" of approximately €102 million of PIK notes. (*Cortlandt I* complaint ¶ 22.) The defendants in this action are the issuer of the PIK notes, Hellas Telecommunications Finance, S.C.A. (Hellas Finance or issuer); the guarantor of the PIK notes, Hellas Telecommunications I, S.à.r.l. (Hellas I or guarantor); and Hellas Telecommunications, S.à.r.l. (Hellas). Hellas is the parent of Hellas Finance and Hellas I and the general partner of Hellas Finance. As general partner of the issuer, Hellas is allegedly liable, along with the issuer and guarantor, for payment on the notes. (*Id.* ¶¶ 6-7, 25.) The complaint in *Cortlandt I* also names as defendants Apax Partners, LLP (Apax) and TPG Capital, L.P. (TPG).

According to the complaint, Apax and TPG are private equity firms which "placed ownership of Hellas shares in a consortium of private equity investment funds affiliated with, advised and managed by Apax and TPG." (*Id.* ¶ 12.) Apax and TPG caused Hellas to distribute over €1.5 billion to the Hellas shareholders, including the proceeds from the issuance of the PIK notes. (*Id.* ¶¶ 9, 51.) The PIK notes were issued on or about December 21, 2006 (*id.* ¶ 37), and are governed by an indenture of the same date.[1] Hellas owned Hellas I securities consisting of convertible preferred equity certificates (CPECs) and preferred

---

1. Under the terms of the PIK notes, interest payments were payable, at the option of the issuer, by issuance of "Additional Notes"—i.e., by payment in kind. (PIK notes § 1.) Principal, due in 2015, was required to be paid in cash. (*Id.* § 2.)

equity certificates (PECs). In December 2006, Hellas I redeemed CPECs held by Hellas for nearly €974 million. (*Id.* ¶¶ 39-42.) As alleged in more detail in the complaint in a later action brought on the same PIK notes (*see infra* at 549), Hellas distributed the loan proceeds to Hellas' "consortium shareholders" (i.e., the Apax/TPG entities), and over €974 million "was used to redeem CPECs." (*Id.* ¶ 51.) The complaint further alleges that the redemption of the CPECs was a payment of dividends, not a redemption of shareholder debt (i.e., shareholder loans) (*id.* ¶¶ 44-45), and was unlawful because it reduced Hellas I's equity "into a deficit" on December 31, 2006 "leaving Hellas, Hellas I and Hellas Finance unable to pay their creditors, including holders of the PIK Notes." (*Id.* ¶ 55.) The redemption allegedly both "violated statutory limitations on distributions to shareholders and violated fraudulent conveyance law." (*Id.* ¶ 53.) In 2009, the trustee under the PIK note indenture declared an event of default based on the insolvency of a related Hellas entity, Hellas Telecommunications II, S.C.A. (Hellas II). It is undisputed that the PIK notes have not been paid.

*Cortlandt I* alleges that "defendants are liable to plaintiff for amounts due on the PIK Notes" of over €102 million. (*Id.* ¶ 59.) However, the complaint does not in terms plead a cause of action against the Hellas defendants for breach of contract based on failure to pay the PIK notes. Rather, it pleads a first cause of action for violation of prohibitions on redemptions and distributions to shareholders, based on the terms of the CPECs (and PECs); a second cause of action for violation of statutory prohibitions on such distributions under the laws of Luxembourg, the place of the Hellas defendants' incorporation, and New York law, the law that governs the construction of the PIK note indenture; and a third cause of action for fraudulent conveyance based on the redemption of the CPECs (and also PECs) by the Hellas defendants.

The second of the Cortlandt actions on the PIK notes (index No. 653357/11) (*Cortlandt II*) was brought by Wilmington Trust Co., as trustee under the PIK note indenture, and by Cortlandt, as "assignee [of approximately €130 million] of the PIK Notes with full rights under the assignments to collect principal and interest due and to pursue all remedies in its own name or in the name of all owners of the PIK Notes." (*Cortlandt II* complaint ¶ 9.) The complaint does not name any of the Hellas entities from *Cortlandt I* as defendants. Instead, the

caption names Hellas II and two other Hellas entities as defendants, although the definition of the Hellas defendants in the complaint includes the unnamed defendants from *Cortlandt I*—Hellas, Hellas Finance and Hellas I. (*Id.* ¶ 16.) The complaint also names as defendants numerous affiliates of Apax and TPG, which are denominated the "private equity defendants," and their individual principals. The complaint alleges that the Hellas defendants and affiliates are a group of interrelated companies that were organized in 2005 to acquire a Greek telecommunications company (*id.* ¶ 16), and are wholly owned by the private equity defendants. (*Id.* ¶ 26.) Apax and TPG allegedly control the private equity defendants, which in turn controlled, managed, and funded the Hellas defendants and were transferees of fraudulent conveyances. (*Id.* ¶¶ 28, 29.) In particular, the complaint alleges that Hellas II issued CPECs and PECs to Hellas I, Hellas I issued CPECs and PECs to Hellas, and Hellas issued CPECs and PECs to the private equity defendants. (*Id.* ¶ 114.) In December 2006, Hellas II redeemed the CPECs for €979 million, Hellas I redeemed the CPECs for over €973 million, and Hellas redeemed the CPECs held by the private equity defendants for over €973 million. (*Id.* ¶ 137.) All of the redemptions were allegedly made at substantially overvalued rates (*id.* ¶¶ 140-141), and at a time when the Hellas defendants were already insolvent. (*Id.* ¶ 129.)

The *Cortlandt II* complaint pleads a first cause of action against Hellas Finance, Hellas I and Hellas to recover on the PIK notes. As noted above, these Hellas entities were named as defendants in *Cortlandt I* but are not named in this action.[2] The second cause of action in the *Cortlandt II* complaint is pleaded against all defendants for breach of contract, based on the allegation that defendants breached the PIK notes and PIK note indenture by redeeming the CPECs and PECs without paying or providing for payment of the notes. (*Id.* ¶ 167.) The third cause of action alleges that the redemptions violated New York and Luxembourg laws prohibiting distributions to shareholders where a corporation is insolvent or would be made insolvent by the distribution. The fourth cause of action alleges that the private equity defendants are the alter egos of the Hellas defendants and are liable for payment of the PIK notes.

---

**2.** The complaint in *Cortlandt II* alleges that the Hellas defendants from *Cortlandt I*, although not named in *Cortlandt II*, are included in the definition of defendants in *Cortlandt II* "in anticipation of and to facilitate consolidation of the two cases." (*Cortlandt II* complaint ¶ 12 [b].)

The fifth through eighth causes of action against all defendants allege fraudulent conveyances under the New York Debtor and Creditor Law, based on the alleged transfer of the proceeds of the PIK notes among the various Hellas entities for no consideration and ultimate transfer of such proceeds to the private equity defendants "in exchange for CPECs, a security that imposed no obligation on Hellas to repay anything at any time." (*Id.* ¶ 190.) The tenth cause of action against the private equity defendants is for unjust enrichment.

The third PIK note action, involving the same PIK notes as in *Cortlandt I* and *II*, is a motion for summary judgment in lieu of complaint (index No. 653363/11). This motion-action is brought by WTC, as trustee under the PIK note indenture, and by Cortlandt, as assignee, against Hellas Finance and Hellas I, as issuer and guarantor, to recover on the PIK notes.

The fourth action is an action on the sub notes (index No. 653181/11). This action was brought only by Cortlandt against Hellas II and against the Hellas and Apax/TPG entities named as defendants in *Cortlandt I* and *II*. The complaint alleges a first cause of action against Hellas II as issuer, Hellas I as guarantor, and Hellas as general partner, for payment of the sub notes. The remaining causes of action are substantially similar to the causes of action in *Cortlandt II*.

Defendants moved to dismiss each of the four actions on various procedural grounds, among them that Cortlandt lacks standing to maintain the actions. Plaintiff subsequently moved in the sub note action for leave to amend and supplement the complaint to add SPQR Capital (Cayman) Ltd., Cortlandt's assignor, as a plaintiff, to delete certain defendants (not including any of the Hellas or Apax/TPG defendants), and to add allegations to the complaint regarding Cortlandt's standing. This court held the motions to dismiss in abeyance pending hearing of the motion to amend. For the reasons that follow, the court holds that Cortlandt lacks standing to maintain these actions and that, although the standing defect is not jurisdictional and may be cured, plaintiffs have not cured the defect.

### Motions to Dismiss for Lack of Standing

As noted above, in *Cortlandt I*, Cortlandt's allegation with regard to its standing is that it is "the assignee and agent for collection" of approximately €102 million of the PIK notes. (*Cortlandt I* complaint ¶ 22.) In *Cortlandt II*, Cortlandt elaborates on its standing as follows:

"Cortlandt is the assignee of €130,770,266 of the PIK Notes with full rights under the assignments to collect principal and interest due and to pursue all remedies in its own name or in the name of all owners of the PIK Notes ('Noteholders'). The assignors of the PIK Notes own book entry interests in the PIK Notes (the 'Book Entry Interests') with the contractual right post-default under § 2.07 (a) of the PIK Indenture (defined below) to exchange the Book Entry Interests for definitive notes by the Issuer ('Definitive Notes'). Procedures to make the exchange provided in the PIK Indenture were never established by the defaulting Issuer and should be deemed waived to the extent issuance of Definitive Notes may be a contractual requirement to sue." (*Cortlandt II* complaint ¶ 9.)

The motion for summary judgment in lieu of complaint identifies Cortlandt as the assignee of €130,770,266 of the PIK notes. (Healy aff in support ¶ 2.)

The complaint in the sub notes action alleges that "Cortlandt is the assignee of €77,100,000 of the Sub Notes with full rights under the assignments to collect principal and interest due and to pursue all remedies in its own name or in the name of all owners of the assigned Sub Notes ('Assigned Noteholders')." (Sub notes complaint ¶ 9.) It contains allegations substantially similar to those in the *Cortlandt II* complaint regarding the rights of the assigned noteholders to exchange their book entry interests for definitive notes (*id.* ¶ 10), and alleges that Cortlandt requested Hellas II to issue definitive notes, but that Hellas II and its administrators, Ernst & Young LLP, refused to issue definitive notes. (*Id.* ¶ 11.)

The proposed amended complaint in the sub note action seeks to add SPQR, the holder of the book entry interests and Cortlandt's assignor, as plaintiff. It also seeks to add the following allegations regarding standing: The original assignment from SPQR to Cortlandt provided as follows: "The Noteholder hereby assigns to Cortlandt Street Recovery Corp. ('CSRC') full rights to collect amounts of principal and interest due on the Notes, and to pursue all remedies with respect to the Notes against Hellas II . . . and any other person or entity who may be liable to Noteholder." (Amended complaint ¶ 9 [a].) In August 2013, the assigned noteholders executed addendums clarifying the assignments to state that it was the intent of each assigned noteholder from the start to assign "all right,

title and interest" to Cortlandt. (*Id.* ¶ 9 [b].) The addendums provide as follows:

> "Assignor[ ] hereby assigns, transfers, grants and sets over to Cortlandt Street Recovery Corp. . . . all rights, including, but not limited to, all right, title and interest, including ownership, proprietary, legal, equitable and beneficial interests in all claims, including, but not limited to, all demands, claims for relief, causes of action and choses of action, arising from, related to, or concerning its ownership of Subordinated Notes [issued by Hellas II] . . . including, but not limited to, all of Assignor's right, title and interest in collection of principal, interest and other amounts owed on account of or pursuant to the Subordinated Notes. . . . This Assignment clarifies and supplements an earlier assignment between Assignor and CSRC dated [October 6, 2010] and in the event of any conflict between the two, this Assignment shall prevail."[3] (*Id.*)

The proposed amended complaint further alleges that in January 2012, this court (Fried, J.) ordered Hellas II to issue definitive notes. Hellas II's administrators were replaced by liquidators, who agreed in August 2013 to cause Hellas II to issue definitive notes. In September 2013, however, the liquidators "granted SPQR individual creditor status instead." (*Id.* ¶¶ 11-12.)

In moving to dismiss Cortlandt's claims on the ground that it lacks standing to maintain these actions, defendants argue, and Cortlandt does not dispute, that the PIK and the sub notes indentures both authorize only a "Holder" of notes (holder) or the trustee to maintain an action to recover on the notes. (Indentures §§ 6.03, 6.06-6.08.)[4] Holder is defined in both indentures as: "with respect to any Note, the Person in whose

---

3. The addendums to the original sub note assignment are accurately quoted in the proposed amended complaint. (*See* addendum dated Aug. 14, 2013 [Stamell affirmation in support of motion to amend, exhibit C].)

4. Section 6.03, which is discussed further below, authorizes the trustee to sue to collect the payment of principal and interest on the notes. Sections 6.06 and 6.07 afford holders, as defined by the indenture, the right to bring suit to recover on the notes. Section 6.06 is a no-action clause, which provides in pertinent part: "Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to this Indenture or the Notes unless" the holder complies with conditions set forth. Section 6.07 provides, in pertinent part, that "the right of any Holder of a Note . . . to bring suit for the enforcement of any such

name such Note is registered in the register maintained by the registrar pursuant to the provisions of this Indenture." "Definitive Note" is defined in both indentures as: "a certificated Note registered in the name of the Holder thereof." Cortlandt does not dispute that it is not a holder of either the PIK or sub notes, and that the initial assignment to it was of the right to collect the amounts due on the notes, and not an assignment either of the notes or of title to or ownership of the claims.

In *Cortlandt Street Recovery Corp. v Deutsche Bank AG, London Branch* (2013 WL 3762882, 2013 US Dist LEXIS 100741 [SD NY, July 18, 2013, No. 12 Civ. 9351 (JPO), Oetken, J.], *appeal dismissed* US Ct App, 2d Cir, Sept. 16, 2013, No. 13-3266), the court granted a motion to dismiss Cortlandt's action to recover on subordinated notes issued by Hellas II, based on Cortlandt's lack of standing. The complaint, like the complaints here, alleged that Cortlandt was the assignee of the notes with a "right to collect." In opposition, Cortlandt produced an assignment for PIK (not sub) notes, which, like the assignments here for both the PIK and sub notes, provided that the noteholder assigned to Cortlandt full rights to collect the principal and interest due on the notes and to pursue all remedies with respect to the notes. In dismissing the action, the court reasoned that the pleading did not allege, and the written assignment did not state, that "*title* to or *ownership* of the *claims* has been assigned to Cortlandt." (2013 WL 3762882, *2, 2013 US Dist LEXIS 100741, *7.) Moreover, the grant of a power of attorney—i.e. power to sue on and collect on a claim—"is not the equivalent of an assignment of ownership." (2013 WL 3762882, *1, 2013 US Dist LEXIS 100741, *5.) The court concluded that because the assignment did not manifest the owners' intention to transfer title or ownership to Cortlandt, Cortlandt failed to satisfy the standing requirements of article III of the US Constitution, which provides that federal courts may decide cases or controversies. (2013 WL 3762882, 2013 US Dist LEXIS 100741.)

New York does not have an analogue to article III. (*Society of Plastics Indus. v County of Suffolk*, 77 NY2d 761, 772 [1991].) However, the New York standards for standing are analogous, as New York requires "[t]he existence of an injury in fact—an actual legal stake in the matter being adjudicated." (*Id.*) This

---

payment [of principal, premium, if any, and interest on the Note] . . . shall not be impaired or affected without the consent of such Holder [subject to the proviso further set forth]."

requirement "ensures that the party seeking review has some concrete interest in prosecuting the action which casts the dispute in a form traditionally capable of judicial resolution." (*Id.* [internal quotation marks and citation omitted]; *accord Silver v Pataki*, 96 NY2d 532, 539 [2001], *rearg denied* 96 NY2d 938 [2001].)

Under long-standing New York law, an assignee is the "real party in interest" where the "title to the specific claim" is passed to the assignee, even if the assignee may ultimately be liable to another for the amounts collected. (*Allen v Brown*, 44 NY 228, 231 [1870]; *Spencer v Standard Chems. & Metals Corp.*, 237 NY 479, 480-481 [1924] [plaintiff with power of attorney authorizing collection of sums due third party was not assignee, as assignee "must have some title, legal or equitable, to the thing assigned"]; *Fairchild Hiller Corp. v McDonnell Douglas Corp.*, 28 NY2d 325, 330 [1971] [assignee was real party in interest where "title to the cause of action . . . reside(d) with" assignee, notwithstanding that assignee had agreement with third party to share proceeds of amount recovered]; *Sardanis v Sumitomo Corp.*, 282 AD2d 322, 323 [1st Dept 2001] ["To be a real party in interest, an assignee must have some title, legal or equitable, to the thing assigned" (internal quotation marks and citation omitted)].)

This doctrine is fully consistent with federal law under which an assignee for purposes of collection—i.e., an assignee who has promised to remit proceeds of the litigation to its assignor—has standing to bring suit, provided that the assignment transferred to the assignee title to the claims. (*Sprint Communications Co. v APCC Services, Inc.*, 554 US 269, 285 [2008].)[5]

On this authority, this court concurs with the reasoning of the federal court in *Cortlandt Street Recovery Corp. v Deutsche Bank AG* (2013 WL 3762882, 2013 US Dist LEXIS 100741 [SD NY, July 18, 2013, No. 12 Civ. 9351 (JPO)], *supra*).

---

5. As indicated by the Supreme Court's exhaustive review of the evolution of state and federal law on the rights of assignees to sue, the requirement that the assignment vest title in the assignee appears to have developed in light of the prohibition on champerty and maintenance ("officious intermeddling with litigation"), which underlay the ancient common-law prohibition on assignments. (*See Sprint*, 554 US at 275-276, 306-308 [dissent].) The requirement that the assignment transfer title also reflects a concern that the defendant be protected against any subsequent claim by the assignor in the event the defendant pays a judgment to the assignee. (*See Allen v Brown*, 44 NY at 233; *Sardanis*, 282 AD2d at 323 [1st Dept 2001].)

The court holds that the assignments to Cortlandt for both the PIK and sub notes were assignments of a right of collection, not of title to the claims, and are accordingly insufficient as a matter of law to confer standing upon Cortlandt.

Defendants' motions to dismiss *Cortlandt I* for lack of standing will be granted, as the action was brought only by Cortlandt. The motions to dismiss Cortlandt as a plaintiff in *Cortlandt II* and in the motion for summary judgment in lieu of complaint will also be granted. WTC remains a plaintiff in those cases, and plaintiffs do not seek to amend the pleadings to cure the defect in Cortlandt's standing. Plaintiffs move for leave to re-plead the allegations regarding standing only in the sub notes action. The court accordingly turns to the issue of whether the defect in Cortlandt's standing is curable and was in fact cured by the addendums—i.e., amended assignments—for the sub notes.

## Motion to Amend the Complaint in the Sub Notes Action

Standing is "an aspect of justiciability which, when challenged, must be considered at the outset of any litigation." (*Society of Plastics Indus.*, 77 NY2d at 769.) The Court of Appeals has held unequivocally, albeit without elaboration, that a "challenge to [a party's] standing was waived because it was not raised as an affirmative defense, or by way of motion to dismiss." (*Matter of Fossella v Dinkins*, 66 NY2d 162, 167 [1985]; *Dougherty v City of Rye*, 63 NY2d 989, 991-992 [1984].) The Court has, however, also noted that "questions of . . . standing of parties may be characterized as raising questions of subject matter jurisdiction." (*Lacks v Lacks*, 41 NY2d 71, 74 [1976], *rearg denied* 41 NY2d 862 [1977]; *Matter of Dental Socy. of State of N.Y. v Carey*, 61 NY2d 330, 339 [1984, Simons, J., dissenting] [characterizing standing as a "threshold jurisdictional issue"].) Subsequent intermediate appellate decisions on the issue are in conflict.

A number of decisions hold that lack of standing deprives the court of subject matter jurisdiction and is therefore incurable, based on the settled precept that lack of subject matter jurisdiction cannot be waived. (*See Stark v Goldberg*, 297 AD2d 203, 204 [1st Dept 2002] [holding that "(s)tanding goes to the jurisdictional basis of a court's authority to adjudicate a dispute," and granting sua sponte dismissal despite lack of an objection by defendant to plaintiff's standing]; *People v Grasso*, 54 AD3d 180, 197 [1st Dept 2008] [approvingly citing *Stark* in

support of its holding that "since (standing) goes to the very power of the court to act, (standing) must exist at all stages of the proceeding"]; *Murray v State Liq. Auth.*, 139 AD2d 461, 462 [1st Dept 1988], *lv denied* 72 NY2d 810 [1998] [citing *Lacks* for proposition that "(a) party's standing constitutes a question of subject matter jurisdiction," and holding that "(s)ubject matter jurisdiction cannot be waived"]; *see also Security Pac. Natl. Bank v Evans*, 31 AD3d 278, 283 [1st Dept 2006], *appeal dismissed* 8 NY3d 837 [2007] [dissent, citing *Lacks* for same proposition]; *Wells Fargo Bank, N.A. v Marchione*, 69 AD3d 204, 210 [2d Dept 2009] [holding, without discussion of whether lack of standing is curable, that plaintiff in mortgage foreclosure action lacked standing because it did not have an assignment of the mortgage and note before the action was commenced, and that a retroactive assignment could not confer standing upon plaintiff];[6] *LaSalle Bank Natl. Assn. v Ahearn*, 59 AD3d 911, 912-913 [3d Dept 2009] [holding, without discussion of whether lack of standing is curable, that plaintiff in mortgage foreclosure action did not have standing, where the assignment of the mortgage was written subsequent to commencement of the action, and plaintiff did not have standing at the outset].)

The weight of authority holds, however, that a defense of lack of standing may be waived. As this Department has reasoned:

> "The question of subject matter jurisdiction is a question of judicial power: whether the court has the power, conferred by the Constitution or statute, to entertain the case before it. Because New York's Supreme Court is a court of original, unlimited and unqualified jurisdiction, it is competent to entertain all causes of action." (*Security Pac. Natl. Bank*, 31 AD3d at 280 [internal quotation marks and citations omitted] [majority, holding that as New York Supreme Court "is competent to entertain all causes of action, including mortgage foreclosure actions," an objection to a particular plaintiff's standing

---

6. It is noted that this case was also based on the court's public policy determination that "the fiction of retroactivity . . . should not be applied to affect adversely the rights of third persons," and that "strict compliance" should be required in a mortgage foreclosure action with the requirement that the plaintiff have a legal or equitable interest in the mortgage at the time of commencement of the action. (*Wells Fargo Bank, N.A. v Marchione*, 69 AD3d at 210 [internal quotation marks and citation omitted].)

to bring a mortgage foreclosure action could be waived].)

As the Second Department has similarly held:

"A court lacks subject matter jurisdiction when it lacks the competence to adjudicate a particular kind of controversy in the first place. . . . Whether the action is being pursued by the proper party is an issue separate from the subject matter of the action or proceeding, and does not affect the court's power to entertain the case before it." (*Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d 239, 243, 244 [2d Dept 2007] [holding, in mortgage foreclosure action in which plaintiff did not receive an assignment of the mortgage until after commencement of the action, that plaintiff's lack of standing "was not a jurisdictional defect that was so fundamental to the power of adjudication of a court that it could not be waived" (internal quotation marks and citation omitted)]; *see also CDR Créances S.A.S. v Cohen*, 77 AD3d 489, 490-491 [1st Dept 2010] [holding that lack of standing defense "do(es) not implicate subject matter jurisdiction" and is subject to waiver]; *HSBC Guyerzeller Bank AG v Chascona N.V.*, 42 AD3d 381, 382-383 [1st Dept 2007] [permitting substitution of plaintiff in foreclosure action where assignment of note to original plaintiff was invalid, and substituted party and original plaintiff were affiliates].)

The Court of Appeals' decision in *Lacks* in fact supports the cases that have held that a claim of lack of standing may be waived. The issue before the Court, on the appeal of a determination of a defendant wife's motion to vacate a judgment in a matrimonial action, was whether the plaintiff husband's alleged failure to comply with statutory residence requirements deprived the court of subject matter jurisdiction. The Court elucidated the concept of subject matter jurisdiction, stating that "[j]urisdiction is a word of elastic, diverse, and disparate meanings." (41 NY2d at 74.) Although the Court noted that "questions of mootness and standing of parties may be characterized as raising questions of subject matter jurisdiction," it immediately went on to say: "But these are not the kinds of judicial infirmities to which CPLR 5015 (subd [a], par 4) is addressed. That provision is designed to preserve objections so fundamental to the power of adjudication of a court

that they survive even a final judgment or order." (*Id.* at 74-75.) The Court further distinguished between "a court's competence to entertain an action," absence of which deprives the court of subject matter jurisdiction, and its "power to render a judgment on the merits," absence of which does not affect subject matter jurisdiction. (*Lacks*, 41 NY2d at 74-75; *see also Miraglia v H & L Holding Corp.*, 67 AD3d 513, 515 [1st Dept 2009], *lv dismissed and denied* 14 NY3d 766 [2010] [holding that a defense does not involve subject matter jurisdiction where the court "had jurisdiction of the general subject matter but a contention is made after judgment that the court did not have power to act in the particular case or as to a particular question in the case" (internal quotation marks and citation omitted)].)

Here, following the predominant and more persuasive authority, the court holds that an objection to an assignee's lack of standing to recover on a note is curable or, put another way, is not so fundamental as to implicate the court's subject matter jurisdiction or power to hear an action on the note. (*See Lacks*, 41 NY2d at 74-75; *Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d at 243-244 [discussing the conflicting authorities, including *Lacks*, on whether lack of standing is jurisdictional]; *see also Springwell Nav. Corp. v Sanluis Corporacion, S.A.*, 81 AD3d 557 [1st Dept 2011] [not addressing whether lack of standing is jurisdictional, but holding that a dismissal for lack of standing is not on the merits and that newly conferred rights can cure a lack of standing].) Cortlandt's lack of standing to maintain this action under an assignment that gives it only a right of collection is therefore subject to cure.

■ The court must accordingly address Cortlandt's motion for leave to amend the allegations regarding its standing. Leave to amend should be freely granted absent prejudice or surprise. (CPLR 3025 [b]; *Thomas Crimmins Contr. Co. v City of New York*, 74 NY2d 166, 170 [1989].) Although the party seeking leave "need not establish the merit of its proposed new allegations," it must "show that the proffered amendment is not palpably insufficient or clearly devoid of merit." (*MBIA Ins. Corp. v Greystone & Co., Inc.*, 74 AD3d 499, 500 [1st Dept 2010]; *accord Miller v Cohen*, 93 AD3d 424, 425 [1st Dept 2012].) Applying this standard, the court holds that Cortlandt fails to plead allegations sufficient to support its claim on this motion that any lack of standing on its part has been cured.

Cortlandt contends that the addendums to the original assignments correct its asserted lack of standing to sue on the sub notes. As discussed above (*supra* at 551-552), the addendums do purport to convey to Cortlandt title to the claims of its assignor, SPQR. However, it is undisputed that SPQR holds only book entry interests in the sub notes and is not a holder of definitive notes within the meaning of the indenture (definitive notes). As further discussed above (*id.*), only a holder (or the trustee) is authorized by the indenture to sue on the notes. SPQR therefore could not assign its claim to recover on the notes because SPQR itself lacked the authority to sue on the notes.

An assignee " 'stands in the shoes' of an assignor and thus acquires no greater rights than its assignor." (*American States Ins. Co. v Huff*, 119 AD3d 478, 479 [1st Dept 2014]; *Madison Liquidity Invs. 119, LLC v Griffith*, 57 AD3d 438, 440 [1st Dept 2008].) Moreover, it is well settled that a beneficial holder of a note lacks standing to sue for payments due upon the note where, as here, the indenture reserves the right to sue to the registered holder of the note. (*Springwell Nav. Corp. v Sanluis Corporación, S.A.*, 46 AD3d 377, 377 [1st Dept 2007].) If a party that lacked standing under such an indenture subsequently obtains authorization to sue from a registered holder, its lack of standing is cured. (*Springwell*, 81 AD3d at 557-558.) It is undisputed that such authorization has not been obtained here.

Nor is such authority adequately alleged based on the grant of "individual creditor status" to SPQR by the liquidators of Hellas II. In support of this allegation, Cortlandt relies on a letter, dated September 11, 2013, from a joint liquidator of Hellas II to plaintiffs' counsel (Stamell affirmation in support of motion to amend, exhibit B). In the letter, the joint liquidator refers to a request by SPQR ("your client") for the issuance of definitive notes and acknowledges that, pursuant to indenture section 2.07 (a) (2), a noteholder (here, SPQR) may request the issuance of definitive notes upon an event of default (here, the Hellas II bankruptcy). The joint liquidator states that he has determined that to issue the definitive notes "in the manner required under the Indenture would be unwieldy and require so many amendments as to be impossible to perform, given the Company [Hellas II] is now subject to UK Insolvency Rules." The joint liquidator then discusses a liquidator's power under the UK Insolvency Act to make compromises or arrangements with creditors, and concludes:

"as Joint Liquidator I confirm that I have determined to accept the claim of your client as a creditor of the company and that it is granted individual creditor status, along with other holders of these Subordinated Notes. I understand that you may wish to exhibit this letter to the US Courts in relation to legal standing, and confirm I have no objection in your doing so." (*Id.*)

Significantly, in claiming standing based on this letter, Cortlandt fails to make any showing that the joint liquidator's grant of "individual creditor status" is effective to dispense with the provisions of the indenture authorizing only a holder of definitive notes to sue on them. Cortlandt does not explain the effect of the joint liquidator's grant of individual creditor status to SPQR even for purposes of the UK insolvency proceeding or for purposes of a chapter 15 proceeding (*see* 11 USC § 1501 *et seq.*), which was filed in the US Bankruptcy Court for recognition of the UK proceeding. Nor does Cortlandt make any showing that the determination of the joint liquidator not to issue definitive notes was conclusive, and that no redress was available in the UK insolvency proceeding. Cortlandt also fails to cite any legal authority whatsoever that the grant of individual creditor status is effective, under either New York law or federal bankruptcy law, to override, or excuse compliance with, the provisions of an indenture permitting only holders (or the trustee) to sue. Cortlandt's motion to amend the complaint in the sub notes action to allege Cortlandt's standing and to add SPQR as a party will accordingly be denied. The sub notes action will be dismissed in its entirety because it was brought only by Cortlandt.

### Motion for Summary Judgment in Lieu of Complaint

WTC, the sole remaining plaintiff in this motion-action, moves, in its capacity as trustee under the PIK note indenture, for summary judgment in lieu of complaint, pursuant to CPLR 3213. WTC seeks judgment on the PIK notes at issue in *Cortlandt I* and *II*, in the amount of not less than €333,205,735, plus indenture trustee fees, costs and expenses, including attorney's fees, of not less than $250,000. Defendants Hellas Finance and Hellas I cross-move to dismiss the action, pursuant to CPLR 3211 (a) (3) and (4).

It is well settled that an instrument

"comes within CPLR 3213 'if a prima facie case

would be made out by the instrument and a failure to make the payments called for by its terms.' The instrument does not qualify if outside proof is needed, other than simple proof of nonpayment or a similar de minimis deviation from the face of the document." (*Weissman v Sinorm Deli*, 88 NY2d 437, 444 [1996], quoting *Interman Indus. Prods. v R. S. M. Electron Power*, 37 NY2d 151, 155 [1975] [other citations omitted].)

Once the plaintiff submits evidence establishing

"the existence of a promissory note executed by the defendant containing an unequivocal and unconditional obligation to repay and the failure of the defendant to pay in accordance with the note's terms . . . the burden shifts to the defendant to submit evidence establishing the existence of a triable issue with respect to a bona fide defense." (*Zyskind v FaceCake Mktg. Tech., Inc.*, 101 AD3d 550, 551 [1st Dept 2012].)

The relevant terms of the PIK notes and indenture are as follows: The PIK notes state on their face that the principal sum of €200,000,000 is due on July 15, 2015 (PIK note No. 1 at 1), and provide for the issuer's payment of interest on January 1, April 1, July 1 and October 1, at the rate per annum, reset quarterly, "of EURIBOR, plus 8.0% as determined by the Calculation Agent." (*Id.* §§ 1, 2.) The notes further define "Events of Default," which include commencement of a voluntary case within the meaning of any Bankruptcy Law by the parent guarantor, issuer, any guarantor or any significant subsidiary. (*Id.* § 13 [9].) The notes specify that upon an event of default specified in subsection 9, "all outstanding Notes will become due and payable immediately without further action or notice." (*Id.* § 13.) The notes provide that they "are subject to all terms and provisions of the Indenture" dated December 21, 2006, and that "[c]apitalized terms defined in the Indenture and not defined herein have the meanings ascribed thereto in the Indenture." (*Id.* § 4.) The term parent guarantor is defined in the indenture as Hellas I. The notes state that "each Guarantor has jointly and severally unconditionally guaranteed the Issuer's obligations on a senior basis pursuant to the terms of the Indenture." The indenture in turn provides that the parent guarantor "unconditionally guarantees . . . to each Holder of a Note . . . that (1) the principal of, premium and Additional Amounts, if any, and interest on, the Notes will be promptly

paid in full when due, whether at maturity [or] by acceleration." (Indenture § 12.01 [a] [1].) Each guarantor also agrees to pay "any and all costs and expenses (including counsel fees and expenses) properly incurred by the Trustee or the Holders in enforcing any rights under the Guarantees." (*Id.* § 12.01 [a].)

It is undisputed that on November 27, 2009 the Bank of New York Mellon, then indenture trustee, issued a notice of event of default (Healy aff, exhibit E) due to the commencement of an insolvency proceeding by defendants' affiliate, Hellas II. This notice accelerated payment, and declared all outstanding principal and interest due and immediately payable under the terms of the indenture without further action or notice.

Under an "Agreement of Resignation, Appointment, and Acceptance," dated August 31, 2010 (*id.*, exhibit D), by and among Hellas Finance, WTC, and other parties, WTC became the successor trustee to Bank of New York Mellon under the December 21, 2006 PIK notes indenture. As attested by WTC's vice-president, Patrick Healy,[7] and confirmed by the documentary evidence, in its December 31, 2009 audited financial statements, Hellas Finance acknowledged the event of default on the PIK notes, and that the amount then due on the notes was €268,000,000. This amount includes PIK notes of €68,000,000 issued to pay interest through October 15, 2009. In its December 31, 2010 audited financial statements, Hellas I acknowledged the event of default on the PIK notes, stating that credit institutions can request repayment of the amount due on the PIK notes at any time. (Healy aff ¶¶ 10-11, exhibits F, G.)

Healy further attests that, to date, defendants have failed to make any payments to WTC. The last interest payment was made by issuance of PIK notes on October 15, 2009. As of November 2011, when his affidavit was sworn, the amount of principal, interest, and default interest due under the PIK notes was over €333 million, not including approximately $250,000 in additional amounts due under the indenture for indenture trustee fees and costs and expenses, including attorney's fees, incurred by plaintiffs in enforcing their rights under the indenture. (Healy aff ¶¶ 12-13.)

WTC establishes a prima facie case in support of its motion for summary judgment by adducing proof of the PIK notes and

---

**7.** In his affidavit, Healy does not state his title. However, in his capacity as WTC's vice-president, he signed the agreement by which WTC became the successor trustee.

guaranty, containing unconditional payment obligations, as well as proof, including the Healy affidavit and the annexed documentary evidence, showing that Hellas Finance has defaulted on the PIK notes, and Hellas I has not paid the guaranty in accordance with its terms.

In opposition, defendants do not dispute WTC's factual assertions that the PIK notes are in default because of the bankruptcy, the date for the repayment of the PIK notes has been accelerated, the trustee has made a demand for payment of the PIK notes, and the PIK notes have not been paid. Rather, they assert two procedural defenses to this action.

First, defendants argue that this action should be dismissed, pursuant to CPLR 3211 (a) (4), on the ground that *Cortlandt I* is an action pending between the same parties for the same cause of action. As noted above, the *Cortlandt I* complaint alleges that "defendants are liable to plaintiff for amounts due on the PIK Notes," but does not expressly plead a breach of contract cause of action against the Hellas defendants for recovery on the notes. By decision on the record on May 31, 2013, this court denied a motion to amend the *Cortlandt I* complaint which sought, among other things, to plead this cause of action and to add WTC as a plaintiff. Thus, there is not in fact another action pending between the parties on the same cause of action. That said, this court does not condone plaintiffs' pleading of serial actions based on the same transactions. As defendants have aptly stated, plaintiffs' pleading has created a procedural morass. The court nevertheless declines to dismiss the CPLR 3213 action because it is the only action by a party with standing (WTC) which pleads the express breach of contract cause of action, and because the action is meritorious.

Defendants further argue that relief is not available under CPLR 3213 because the right to bring an action, the right to recover under the guarantee, and the calculation of the sum due cannot be ascertained without reference to the indenture, which is not itself an instrument for the payment of money only. (Defendant's mem in opp at 14-15.) This argument is unpersuasive.

As discussed above, the PIK notes expressly provide for defendants' absolute, unconditional obligation to pay the principal and interest due, specify the amount of principal and the basis for calculation of interest, and define the events of default. The PIK notes also specify that the guarantor unconditionally

guarantees the issuer's obligations on the notes, although they refer to and incorporate the indenture for the terms of the guarantee.

The PIK notes are indisputably instruments for the payment of money only, as the right to repayment appears on their face. The PIK notes refer to the terms of the indenture only to the extent necessary for the enforcement of the PIK notes. Therefore, even if the indenture is not an instrument for the payment of money only, CPLR 3213 is applicable. (*See Embraer Fin. Ltd. v Servicios Aereos Profesionales, S.A.*, 42 AD3d 380, 381 [1st Dept 2007] [holding that where the "plain language of the promissory note at issue establishes as a matter of law defendant's absolute, unconditional obligation to pay (specified principal and interest), and incorporates by reference the terms and conditions of (a companion sale agreement) only to the extent necessary for the enforcement of the note," the two agreements are "not inextricably intertwined and CPLR 3213 is applicable"]; *see also Boland v Indah Kiat Fin. [IV] Mauritius*, 291 AD2d 342, 342 [1st Dept 2002] [rejecting argument that CPLR 3213 was inapplicable where promissory note provided for acceleration of balance upon event of default, but referred to indenture for definition of event of default and the procedure for implementing acceleration].)[8]

As to the guarantee in particular, the terms of the indenture do not alter the unconditional obligation to pay imposed by the PIK notes. Thus, recovery is properly sought pursuant to CPLR 3213. (*Compare Seaman-Andwall Corp. v Wright Mach. Corp.*, 31 AD2d 136, 139 [1st Dept 1968], *affd no op* 29 NY2d 617 [1971]; *Juste v Niewdach*, 26 AD3d 416, 416-417 [2d Dept 2006] [holding that provisions in guaranty which "did not require additional performance as a condition precedent to repayment, or otherwise alter the defendant's promise of payment," did not constitute a bar to CPLR 3213 relief]; *Bank of Am., N.A. v Solow*, 59 AD3d 304 [1st Dept 2009], *lv dismissed* 12 NY3d 877 [2009], *affg* 19 Misc 3d 1123[A], 2008 NY Slip Op 50830[U] [Sup Ct, NY County 2008, Fried, J.], and authorities cited therein, *with Dresdner Bank AG. [N.Y. Branch] v Morse/Diesel,*

---

8. Defendants also assert that this action does not qualify for CPLR 3213 relief because resort to extrinsic evidence is necessary to establish WTC's status as trustee. WTC annexes to this action a copy of the agreement with the Hellas entities by which it was appointed successor to the trustee named in the indenture. (Healy aff, exhibit D.) This document is the kind of "simple proof" acceptable on a 3213 motion. Moreover, defendants do not dispute that WTC is the current trustee.

*Inc.*, 115 AD2d 64, 68 [1986] [holding that guarantee of both payment and performance is not an instrument for the payment of money only].)

This is not a case in which the amount of principal and interest owed by the issuer or guarantor cannot be ascertained from the face of the notes, and where "outside proof is needed, other than simple proof of nonpayment" to calculate the amount due. (*See e.g. Weissman v Sinorm Deli*, 88 NY2d at 444; *HSBC Bank USA v IPO, LLC*, 290 AD2d 246, 246 [1st Dept 2002]; *Matas v Alpargatas S.A.I.C.*, 274 AD2d 327, 328 [1st Dept 2000]; *Beal Bank v Melville Magnetic Resonance Imaging*, 270 AD2d 440, 440-441 [2d Dept 2000].) In this regard, it is noted that defendants have not challenged the computation in the affidavit submitted by WTC in support of the motion. (*See* Healy aff ¶ 13.)[9]

The court accordingly holds that WTC is entitled to judgment against defendants Hellas Finance and Hellas I for principal and interest due under the PIK notes and indenture. As to WTC's claims for attorney's fees and expenses, defendants acknowledge that WTC seeks such fees for enforcement of the notes pursuant to section 7.07 of the indenture. (Defendants' mem in opp at 20.) The PIK notes do not expressly provide for the issuer to pay the trustee's fees and expenses in recovering payment of principal and interest. As discussed above, however, the PIK notes provide that they are subject to the terms of the indenture. Section 7.07 (b) provides that "the Issuer, failing which any Guarantor" shall indemnify the trustee for its "expenses of enforcing this Indenture against the Issuer and each Guarantor." Section 7.07 (e) provides that the trustee's expenses after an event of default "include[ ] the fees and expenses of its agents and counsel." The PIK notes, as quoted above, also provide that the guarantor unconditionally guarantees the issuer's obligations pursuant to the indenture which, in turn, states that the guarantor agrees to pay attorney's fees and expenses in enforcing the guarantee. Although the amount of the attorney's fees and expenses is not ascertainable from the face of the PIK notes or indenture, a hearing is properly held on this issue, notwithstanding that judgment is awarded pursuant to CPLR 3213. (*Griffon V, LLC v 11 E. 36th, LLC*, 90 AD3d 705, 708 [2d Dept 2011]; *Premium Assignment*

---

**9.** This computation will, of course, need to be updated to account for the passage of time since service of the moving papers.

*Corp. v Utopia Home Care, Inc.*, 58 AD3d 709, 709 [2d Dept 2009].)

## Trustee's Claims in *Cortlandt II*

The court turns, finally, to the branch of defendants' motions to dismiss WTC's claims in *Cortlandt II*. Defendants argue that the PIK notes indenture does not authorize WTC to pursue any of the causes of action pleaded in *Cortlandt II*, and that WTC therefore lacks standing to maintain the action. (Defendants' mem in support at 35.) More particularly, defendants claim that the indenture does not authorize the causes of action because they are pleaded against third parties, the "private equity" defendants and their principals, who were not issuers or guarantors of the notes and were not parties to the indenture, and because they allege the types of claims—e.g., fraud—that are beyond the scope of the trustee's limited authorization. (Defendants' mem in support at 35-36.) WTC claims authority to maintain the pleaded causes of action under sections 6.03, 6.05, 6.06, 7.01, and 11.04 of the indenture. (Plaintiffs' mem in opp at 37.)

It is well settled that an indenture trustee's authority is defined by the terms of the trust indenture. (*See AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146, 156 [2008]; *Beck v Manufacturers Hanover Trust Co.*, 218 AD2d 1, 13 [1st Dept 1995] [holding that indenture trustee has fiduciary duty and must act prudently in the post-default context, "but only in the exercise of those rights and powers granted in the indenture. The scope of the trustee's obligation then is still circumscribed by the indenture, albeit less narrowly"].)[10] It is further settled that "[a] trust indenture is a contract, and under New York law '[i]nterpretation of indenture

---

**10.** The New York and federal courts have consistently distinguished between an indenture trustee's duties before and after a default. As the Second Circuit explained, in discussing the trustee's pre-default duties, it is "well-established under state common law that the duties of an indenture trustee are strictly defined and limited to the terms of the indenture." (*Elliott Assoc. v J. Henry Schroder Bank & Trust Co.*, 838 F2d 66, 71 [2d Cir 1988], citing New York cases, including *Hazzard v Chase Natl. Bank of City of N.Y.*, 159 Misc 57 [Sup Ct, NY County 1936], *affd* 257 App Div 950 [1st Dept 1939], *affd* 282 NY 652 [1940], *cert denied* 311 US 708 [1940].) The rationale for this rule is that

> "[a]n indenture trustee is not subject to the ordinary trustee's duty of undivided loyalty. Unlike the ordinary trustee, who has historic common-law duties imposed beyond those in the trust agreement, an indenture trustee is more like a stakeholder

provisions is a matter of basic contract law.' " (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 NY3d 549, 559 [2014] [citations omitted].) The court must accordingly analyze the PIK note indenture to determine whether it authorizes WTC to sue on the causes of action in the *Cortlandt II* complaint.

Section 6.03 of the indenture, entitled "Other Remedies," provides: "If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy to collect the payment of principal, premium, if any, and interest on the Notes or to enforce the performance of any provision of the Notes or this Indenture." Although the parties do not cite, and the court's own research has not located, any New York authority that interprets this or a similar indenture provision, federal courts have construed such provisions. *Regions Bank v Blount Parrish & Co., Inc.* (2001 WL 726989, 2001 US Dist LEXIS 8814 [ND Ill, June 27, 2001, No. 01 C 0031, Pallmeyer, J.]) involved a nearly identical provision, which stated:

> "Other Remedies. If an Event of Default occurs and is continuing, the Trustee may pursue any available remedy by proceeding at law or in equity to collect the principal of, premium, if any, or interest on the Bonds or to enforce the performance of any provision of the Bonds, this Indenture, the Facility Lease Agreement or the Guaranty." (2001 WL 726989, *2, 2001 US Dist LEXIS 8814, *5-6.)

The court rejected the trustee's contention that the "any available remedy" language authorized the trustee to pursue the bondholder's tort claims, including securities fraud claims, and reasoned that such language "refers only to actions designed to 'collect the principal of, premium, if any, or interest on the Bonds' or to enforce the performance of any provision of the bonds or the Indenture . . . [and] does not give [the trustee] power to protect any and all rights of the bondholders." (2001 WL 726989, *5, 2001 US Dist LEXIS 8814, *12-13.)

In *Continental Bank, N.A. v Caton* (1990 WL 129452, 1990 US Dist LEXIS 11624 [D Kan, Aug. 6, 1990, No. 88-1611-C]),

---

whose duties and obligations are exclusively defined by the terms of the indenture agreement." (*Meckel v Continental Resources Co.*, 758 F2d 811, 816 [2d Cir 1985].)

As held in *AG Capital* (11 NY3d at 156-157), although a trustee does not have pre-default fiduciary duties, it must perform its ministerial functions with due care. As further held in *Beck* (218 AD2d at 13), an obligation will be imposed upon the indenture trustee post-default to act prudently, but its duties will continue to be circumscribed by the indenture.

on which the *Regions* court relied, the indenture provision stated that

> "[a]ll rights of action . . . under this Indenture or under any of the Bonds may be enforced by Trustee . . . and *any such suit or proceeding instituted by Trustee shall be brought in its name as Trustee without the necessity of joining as plaintiffs or defendants any Owner of the Bonds*." (1990 WL 129452, \*4, 1990 US Dist LEXIS 11624, \*13.)

The court held that the indenture limited the trustee's right to bring actions "on the notes or under the indentures," and did not afford the trustee the power "to assert individual tort claims on behalf of the noteholders against third persons which are wholly extraneous to the rights and obligations created by the notes and the indenture agreements." (1990 WL 129452, \*7, 1990 US Dist LEXIS 11624, \*20-21.) The court also approvingly cited authority holding that where the indenture only affords the trustee standing to cure a default on the underlying loan, "fraud claims [which] could have been asserted regardless of breach . . . [are] not a remedy for default." (1990 WL 129452, \*6, 1990 US Dist LEXIS 11624, \*18, citing *United Bank of Arizona v Sun Mesa Corp.*, 119 FRD 430, 431-432 [D Ariz 1988]; *see also Premier Bank v Tierney*, 114 F Supp 2d 877, 881 [WD Mo 2000] [holding that "any such suit" language refers only to legal actions brought to enforce the indenture, mortgage, and bonds].)

In contrast, as the *Regions* court also noted, courts "allow an indenture trustee standing to bring tort claims on behalf of the bondholders only when the indenture carries a broad grant of authority to sue on behalf of the bondholders." (2001 WL 726989, \*5, 2001 US Dist LEXIS 8814, \*13.) Thus, *In re Washington Pub. Power Supply Sys. Sec. Litig.* (623 F Supp 1466, 1483 [WD Wash 1985], *affd on other grounds* 823 F2d 1349 [9th Cir 1987]) held that the trustee had authority to bring a rule 10b-5 securities fraud claim, where the indenture provision authorized the trustee to institute suits for the collection of the bonds and "to protect and enforce its rights and the rights of the holders of the Bonds . . . in the enforcement of any other legal or equitable right as the Bond Fund Trustee, being advised by counsel, shall deem most effectual . . . ."

■ Here, the court holds that section 6.03 of the indenture does not confer broad authority on WTC as trustee to institute all actions to enforce the rights of the bondholders but, rather, limits the authority of WTC to commence actions in the event

of default, for payment "on the Notes" or "to enforce the performance of any provision of the Notes or this Indenture." The fifth through ninth causes of action of the *Cortlandt II* complaint for fraudulent conveyance are not claims brought on the notes or for enforcement of the PIK notes or indenture. (*See Quadrant*, 23 NY3d 549 [discussed *infra* at 570].) They are entirely separate claims that challenge the 2005-2006 transaction by which the Apax/TPG entities created the Hellas defendants, caused Hellas Finance to issue the PIK notes, and then allegedly made the fraudulent conveyances by redeeming the CPECs and PECs that had been issued to the Apax/TPG entities and thus transferring the proceeds of the notes to those entities. These fraudulent conveyance claims could therefore have been brought before the 2009 default in the payment of the notes. The court accordingly rejects WTC's claim that section 6.03 of the indenture authorizes it to pursue the fraudulent conveyance claims.

WTC also claims authority to maintain the claims pursuant to sections 6.05 and 6.06 of the indenture. Section 6.06, the no-action clause, provides in pertinent part: "Except to enforce the right to receive payment of principal, premium (if any) or interest when due, no Holder may pursue any remedy with respect to the Indenture or the Notes," unless the holder has met the specified conditions, including that the holder has "given the Trustee notice that an Event of Default is continuing," "Holders of at least 25% in principal amount of the outstanding Notes have requested the Trustee to pursue the remedy," and "the Trustee has not complied with such request within 60 days after the receipt thereof and the offer of security or indemnity." Section 6.05 provides in pertinent part: "Holders of a majority in aggregate principal amount of the then outstanding Notes may direct the time, method and place of conducting any proceeding for exercising any remedy available to the Trustee or exercising any trust or power conferred on it."

Citing these sections and *Feldbaum v McCrory Corp.* (1992 WL 119095, 1992 Del Ch LEXIS 113 [June 1, 1992, Civ A Nos. 11866, 11920, 12006]), WTC argues that "fraudulent conveyance claims are actions 'with respect to' the Indenture and therefore, clearly within the Trustee's authority to pursue *upon the request or direction of the noteholders*." (Plaintiffs' mem in opp at 38 [emphasis supplied].) In *Feldbaum* the no-action clause in the indenture, similar to that here, prohibited a securityholder from "pursu[ing] *any remedy with respect to this*

*Indenture or the Securities"* unless certain conditions were met, including that the trustee failed to pursue the remedy after the holder gave the trustee notice of a continuing event of default and a majority of the holders requested that the trustee pursue the remedy. (1992 WL 119095, *5, 1992 Del Ch LEXIS 113, *17.) In construing the no-action clause under New York law, the *Feldbaum* court held that the clause "bars all action 'with respect to' the indenture or the securities," that "a fraudulent conveyance action is such an action," and that the security-holder was barred from bringing a fraudulent conveyance claim because the conditions of the no-action clause had not been met. (1992 WL 119095, *7, 1992 Del Ch LEXIS 113, *26-27.)

In *Quadrant*, the Court of Appeals recently construed a no-action clause which prohibited a securityholder who failed to comply with the conditions of the clause from bringing any action "upon or under or with respect to this Indenture." (23 NY3d at 556-557.) The Court held that the plaintiff security-holder's breach of fiduciary duty and fraudulent conveyance claims in connection with notes issued by the defendant were "based not on the indenture agreement . . . but rather [arose] from [the plaintiff's] status as a securityholder." (*Id.* at 567.) The Court accordingly further held that the securityholder's claims were not barred because the no-action clause, unlike that in *Feldbaum*, did not prohibit a securityholder's suit with respect to the securities. (*Id.* at 564.)

*Feldbaum* and *Quadrant* thus considered the impact of a no-action clause on a securityholder's right to bring an action. In discussing the purpose of a no-action clause, the *Quadrant* Court explained that "generally a no-action clause prevents minority securityholders from pursuing litigation against the issuer, in favor of a single action initiated by a Trustee upon request of a majority of the securityholders." (23 NY3d at 565.) The Court also noted that a no-action clause achieves its goals of limiting minority securityholder suits "by *delegating* the right to bring a suit enforcing rights of bondholders to the trustee, or to the holders of a substantial amount of bonds, and by *delegating* to the trustee the right to prosecute such a suit in the first instance." (*Id.* at 566 [emphasis supplied], quoting *Feldbaum*, 1992 WL 119095, *6, 1992 Del Ch LEXIS 113, *21.) *Quadrant* suggests that under a no-action clause, like that at issue, which prohibits post-default securityholder suits absent compliance with the clause, the trustee could bring fraudulent conveyance claims if authorized to do so by the requisite percentage of securityholders. (*See* 23 NY3d at 567-568.)

The court need not reach this issue here, however, as the *Cortlandt II* complaint fails to plead allegations sufficient to support WTC's claim that it was granted such authorization. WTC argues that the holders of the majority of the shares had the right, pursuant to section 6.05 of the indenture, to direct the trustee as to the manner for exercising any remedy, and that "the Trustee received such a direction from Cortlandt." (Plaintiffs' mem in opp at 38.) The complaint alleges in this regard:

> "Cortlandt is authorized by vote of the majority of the Noteholders to exercise the rights of the majority under § 6.05 of an indenture dated December 21, 2006 that governs the PIK Notes . . . and to direct the Trustee to join on behalf of the Noteholders the suit commenced by Cortlandt." (*Cortlandt II* complaint ¶ 10.)

This allegation need not be credited, as it is contradicted by the undisputed evidence on this motion as to SPQR's and Cortlandt's standing. (*See generally Robinson v Robinson*, 303 AD2d 234, 235 [1st Dept 2003] ["(T)he court is not required to accept factual allegations that are plainly contradicted by the documentary evidence or legal conclusions that are unsupportable based upon the undisputed facts"]; *see also Water St. Leasehold LLC v Deloitte & Touche LLP*, 19 AD3d 183 [1st Dept 2005], *lv denied* 6 NY3d 706 [2006].) As acknowledged by Cortlandt (*see supra* at 551-553), Cortlandt was authorized to act by SPQR, which is not a holder within the meaning of the indenture. As SPQR lacked the authority to authorize Cortlandt to bring these causes of action, Cortlandt lacked the authority to direct the trustee to bring the causes of action.

The other sections of the indenture on which WTC relies do not confer authority upon it to maintain the causes of action in *Cortlandt II*. Section 7.01 does not expand the scope of the trustee's authority to commence actions, but defines the trustee's duties pre- and post-default, in conformity with governing law. (*See supra* at 566 n 10.) The portion of section 11.04 (b) on which WTC relies authorizes the trustee to maintain suits "to prevent any impairment of the pledged assets." As WTC acknowledges, the causes of action "seek[ ] to recover fraudulently diverted assets," not to prevent impairment of existing assets. (*See* plaintiffs' mem in opp at 39.)

In sum, the court holds that the indenture does not authorize the trustee to maintain the causes of action pleaded in the *Cortlandt II* complaint. On the authority discussed above, the

fifth through ninth causes of action, which are denominated causes of action for fraudulent conveyance, are not claims for payment "on the Notes" or "to enforce the performance of any provision of the Notes or this Indenture," within the meaning of indenture section 6.03. Further, Cortlandt does not allege facts sufficient to support its claim that it was properly authorized by SPQR to maintain the fraudulent conveyance causes of action. The remaining causes of action, although differently denominated, are all based on the same alleged fraudulent conveyances.[11] Cortlandt therefore lacks standing to maintain this action in its entirety.

In view of this holding, the court does not reach the remaining grounds for dismissal advanced by defendants.

### Leave to Replead

On their motion to amend the sub notes action, plaintiffs request leave to replead the complaint in *Cortlandt I* in the event this court decides that Cortlandt lacks standing. They also appear to request leave to replead the sub notes action in such event. (*See* plaintiffs' mem in support of motion for leave to amend at 3-4, 12-13.) These requests are denied. By orders dated October 31, 2013 in each of the four cases, this court previously granted plaintiffs leave to move to amend to plead facts in support of their standing claim. In requesting leave to

---

11. The fourth cause of action "against the private equity defendants as alter egos for payment of the PIK Notes" should be dismissed for the independent reason that it fails to state a cause of action. The wholly "conclusory allegations in the complaint are insufficient to state a veil-piercing claim." (*Barneli & Cie SA v Dutch Book Fund SPC, Ltd*, 95 AD3d 736, 737 [1st Dept 2012]; *Andejo Corp. v South St. Seaport Ltd. Partnership*, 40 AD3d 407, 407 [1st Dept 2007]; *Albstein v Elany Contr. Corp.*, 30 AD3d 210, 210 [1st Dept 2006], *lv denied* 7 NY3d 712 [2006] [dismissing plaintiff's veil-piercing claim where the complaint contained conclusory allegations that the corporation was "undercapitalized" and functioned as an alter ego, and "failed to plead any facts to substantiate such conclusory claims"].) The roles of the individual defendants in the alleged ownership and domination of the Hellas entities are also largely undifferentiated. Although a plaintiff is not required to state the details of an individual defendant's participation even in a fraud, where those details are peculiarly within the defendant's knowledge, the facts alleged at the motion to dismiss stage must at least be "sufficient to permit a reasonable inference of the alleged conduct." (*See Pludeman v Northern Leasing Sys., Inc.*, 10 NY3d 486, 491-492 [2008].) This requirement is not met by plaintiffs' conclusory group pleading.

Although the alter ego cause of action is insufficiently pleaded, as held in the text, it is not maintainable in any event, as it is duplicative of the fraudulent conveyance causes of action which the trustee is not authorized to maintain.

replead yet again, plaintiffs do not offer "any 'new' facts [that] would overcome the legal defects" in the prior complaints. (*See Pollak v Moore*, 85 AD3d 578, 579 [1st Dept 2011]; *Fletcher v Boies, Schiller & Flexner, LLP*, 75 AD3d 469, 470 [1st Dept 2010] [rejecting plaintiff's "cursory request" for leave to replead "because there was no proposed pleading accompanied by an affidavit of merit"]; *see also AJW Partners, LLC v Admiralty Holding Co.*, 93 AD3d 486, 486 [1st Dept 2012].)

Separate orders will follow, dismissing the complaints in *Cortlandt I* and *II*, granting WTC's motion for summary judgment in lieu of complaint, and dismissing the sub notes action.