[60 NYS3d 110]

NMC RESIDUAL OWNERSHIP L.L.C. et al., Appellants, v U.S. BANK NATIONAL ASSOCIATION, Respondent.

First Department, August 1, 2017

### APPEARANCES OF COUNSEL

*Warner Partners, P.C.*, New York City (*Kenneth E. Warner* of counsel), for appellants.

*K&L Gates LLP*, Charlotte, North Carolina (*John H. Culver III* of the Maryland and North Carolina bars, admitted pro hac vice, of counsel), and *K&L Gates LLP*, New York City (*Lani A. Adler* of counsel), for respondent.

### OPINION OF THE COURT

GISCHE, J.

This appeal concerns the rights and obligations of the parties with respect to the termination of certain REMIC (real estate mortgage investment conduit) trusts. The assets held by the trusts were mortgage loans. The trusts originally sold securities to outside investors, representing two classes of holders, i.e., regular security holders and residual security holders. Plaintiffs, NMC Residual Ownership L.L.C. and Caycorp Holdings, Ltd., are holders of the residual security interests in those trusts. While the holders of regular securities were entitled to receive regular payments on distribution dates, the residual security holders had no such right. Instead, they were entitled to receive the proceeds of the disposition of any asset remaining in the trust REMICs upon their termination, but only after each class of regular security holder had been paid. Plaintiffs' interest is referred to as the trust "equity." The residual holder interest was the riskiest tranche of ownership and any right to payment was subordinate to payment in full of amounts due to the regular interest holders.

Plaintiffs' original breach of contract cause of action alleges that in the process of terminating certain trusts, the defendant trustee sold the trust assets to a third party for a market price that reflected a positive equity value. Plaintiffs further allege that after the sales closed, the trustee improperly kept the equity for itself instead of distributing it to plaintiffs. The trustee, in bringing this motion to dismiss, claims that under the operative trust documents, it was permitted to (and actually did) purchase the trust assets in its own name at a set price, which was less than market value. The trustee argues that under the trust documents, it had the right to purchase trust assets at below market, even though it could resell them within days of acquiring them, allowing the trustee to realize millions of dollars in personal profit. The trustee is alleged to have kept for itself the profit it realized on the forward sale, which was in excess of $3,000,000.

Plaintiffs have stated a viable cause of action for breach of contract that should not have been dismissed. The documentary evidence does not conclusively establish that the trustee actually purchased the trust assets in its own name before reselling them. Even if the sale of assets to the trustee had been conclusively established by documentary evidence, there is still a valid claim that the trustee's actions create a conflict of interest prohibited under the operative trust agreements and in violation of the trustee's contractual obligations. The trust documents do not give the trustee the express right to purchase the trust assets for its own financial benefit at less than market value and to thereby diminish, let alone extinguish, plaintiffs' interest as residual security holders.

Under the trust documents, the trustee's duties are limited to those specifically set forth in the trust agreement. Included among them is the duty to hold all assets of the trust for the exclusive use and benefit of all security holders. In addition, except as otherwise expressly permitted in the trust agreement, the trustee could not in any capacity assert any claim or interest in trust assets.

The parties' disputes broadly involve the contractual rights of the parties in the context of the termination of a trust. Article VI, section 6.01, of the standard REMIC trust provisions (standard trust provisions), which governs the parties' rights upon termination, provides in pertinent part:

"On any Distribution Date on which the aggregate of the Class Principal Balances . . . is less than 1% of the aggregate of the Original Class Principal Balances, the Trustee may . . . effect a termination of the . . . Trust and retirement of the related Securities by purchasing (or causing the sale to one or more third parties of) all of the Trust Assets remaining in the Trust and depositing into the Book-Entry Depository Account the Termination Price therefor."

The "termination price" is defined as "[t]he Aggregate Remaining Balance as of the Termination Date, plus thirty days of accrued interest on the outstanding Trust Assets." In terms of how the liquidation process is to proceed, section 6.01 further instructs that

"[t]he Trustee . . . shall mail notice of any termination to be caused by its purchase of the Trust's assets to Holders not earlier than the fifteenth day and not later than the twentieth day of the month preceding the month of final distribution . . . .

"The following additional requirements shall be met in the event of any termination of the Trust pursuant to this Section. . . .

"(b) upon making final payment of principal and interest . . . or depositing any unclaimed funds . . . in the Termination Account . . . on the final Distribution Date, the Trustee shall distribute . . . to the Holders of the . . . Residual Securities, all cash on hand relating to the applicable Trust REMIC (other than cash retained to meet claims)."

The complaint alleges that the value of the trust principal had met the requirements permitting termination/liquidation of the trust under article VI. A notice of termination dated November 12, 2015, was sent by the trustee to all trust holders. It stated that the trustee was electing to purchase the trust assets for the "[t]ermination [p]rice," terminate the trust and retire all of the holders' securities. The notice specified a final trust distribution date of December 16, 2015. Prior to November 16, however, the trustee had solicited bids from the public to sell the very same assets, had made an agreement to sell the assets for a market price that exceeded the termination price, and set a settlement date for the sale of the assets to a third party on December 17, 2015, just one day after the

projected trust termination date. The profit realized on the forward sale supports the plaintiffs' allegation that at the time of the termination, the value of trust assets exceeded the termination price.*

In support of its motion to dismiss, the trustee contends it elected to terminate the trusts, as it had the right to do, and provided plaintiffs with notice of its intention to purchase the trust assets in its own name at the termination price. The only documentary evidence that the trustee actually purchased the trust assets in its own name is its notice to plaintiffs dated November 12, 2015. While the notice expresses the trustee's intention to purchase certain trust assets in its own name, it does not actually prove that the trustee did so. There has been no discovery and the record is devoid of documentary evidence of payment by defendant to the trusts for any of the assets it purportedly purchased.

In any event, even if the trustee could prove by irrefutable documentary evidence that it actually purchased the trusts' assets in its own name before reselling them for a considerable profit to a third party, plaintiffs still have a viable cause of action for breach of contract. The REMIC trusts at issue are indentures. They bestow legal title of securities on a single trustee, here defendant, who acts to protect the interests of individual investors, who may be numerous or unknown to one another (*Quadrant Structured Prods. Co., Ltd. v Vertin*, 23 NY3d 549, 555 [2014]). Unlike ordinary trustees, the rights and duties of an indenture trustee are not defined by a fiduciary relationship. Instead, they are defined exclusively by the terms of the agreements by which the relationships were formed (*AG Capital Funding Partners, L.P. v State St. Bank & Trust Co.*, 11 NY3d 146, 156 [2008]). That does not mean, however, that an indenture trustee does not owe the security holders a duty of care. It is well recognized by the Court of Appeals that an indenture trustee owes the security holders a duty to perform its ministerial functions with due care (*AG Capital*, 11 NY3d at 157). Most importantly, the courts have recognized that even an indenture trustee has a fundamental duty to avoid conflicts of interest (*id.* at 156-157; *see Commerce Bank v Bank of N.Y. Mellon*, 141 AD3d 413, 416 [1st Dept 2016]; *see also Elliott Assoc. v J. Henry Schroder Bank & Trust*

* The mortgage pools were able to sell above par because the interest rates on the mortgage pools were 7.5% and 8%—far higher than current rates.

*Co.*, 838 F2d 66, 71 [2d Cir 1988]). In this regard, section 4.02 (b) of the standard trust provisions prohibits the trustee from asserting a claim against the trust assets in any capacity, except as otherwise permitted by the trust agreement, because those assets are held for the exclusive benefit of all the investors.

It is clear from the trust documents that the trustee had the right to purchase the trust assets in its own name in connection with the termination of the trust. The salient issue on this motion is whether the trust documents also give the trustee the right to purchase those assets at less than market value. In the absence of an express contractual right to do so, the trustee's actions would clearly constitute a prohibited conflict of interest because it financially benefitted at the expense of the residual security holders. In other words, the trustee completely defeated the equity value otherwise belonging to the residual security holders, by taking that value for itself.

There is nothing in the trust documents that permits the trustee to purchase the trust assets for less than what they are worth. The trustee argues that the trust documents expressly give it the right to purchase the trust assets for the termination price, which is defined in the trust documents as the value of the regular shareholders interest plus 30 days of interest. That "right," however, is not clearly delineated in the trust documents and the operative language contained in section 6.01 of the standard trust provisions merely permits the trustee to terminate the trust by purchasing the assets. There is no express reference to a purchase price or some other equivalent language.

The sole reference in section 6.01 to the termination price is only that the trustee must deposit such amount in the "Book-Entry Depository Account." Under the trust documents, only the regular holders have book-entry securities; the residual security holders have certificated securities (standard trust provisions § 2.01). Thus, the termination price, which reflects the regular shareholders' financial interests, is the only amount that can be deposited into the book-entry depository account. The obligation to deposit a certain sum of money into a book-entry depository account does not equate to the trustee having a right to purchase the trust assets for that deposited sum. Any assets in excess of the termination price received by the trustee would qualify as cash on hand, which the trust instrument expressly provides should be distributed outright to the

residual security holders (standard trust provisions § 6.01 [b]). It is unclear how, as a practical matter, there could ever be cash on hand if the trustee's interpretation of the trust instruments is correct, because the trustee could always keep that entire gain for itself. Such interpretation of the trust documents is untenable and inconsistent with the trustee's duties to the security holders.

Nor does section 6.02 of the standard trust provisions clearly provide that the trust assets may be purchased by the trustee at the termination price. This provision concerns termination of the trust agreement, and provides, among other things, that the trustee's obligations "shall terminate upon (a) the payment of all principal and accrued interest on the Securities and all other amounts due and owing by the Trustee under such Trust Agreement." One of the conditions for termination of the trust is that the trust assets be purchased "at a price equal to the Termination Price." Such language, however, reflects a threshold amount that must be met before the trust can be terminated, not a cap on the amount that is required to be paid for the assets.

We also reject the trustee's argument that once it purchased the trust assets in its own name, whatever responsibilities it had to plaintiffs under the trust documents terminated. The trust documents provide that the obligations of the trustee continue at least through the termination date, here December 16, 2015, and in some instances beyond (standard trust provisions § 6.02).

The motion court, however, correctly dismissed the remaining causes of action. The anticipatory breach claim fails because the complaint merely alleges that defendant had a unilateral obligation to pay money (see Long Is. R.R. Co. v Northville Indus. Corp., 41 NY2d 455, 466 [1977]; Acacia Natl. Life Ins. Co. v Kay Jewelers, 203 AD2d 40, 43 [1st Dept 1994]). The cause of action for breach of the implied covenant of good faith and fair dealing is barred by documentary evidence, namely, section 5.01 (a) of the standard trust provisions, which states, "[N]o implied covenants or obligations shall be read into the . . . Trust Agreement against the Trustee" (see e.g. Plaza PH2001 LLC v Plaza Residential Owner LP, 98 AD3d 89, 100 [1st Dept 2012]). The declaratory judgment claim "is unnecessary and inappropriate" since plaintiffs have "an adequate, alternative remedy in another form of action, such as breach of contract" (Apple Records v Capitol Records, 137 AD2d 50, 54 [1st Dept 1988]).

Accordingly, the order of the Supreme Court, New York County (Jeffrey K. Oing, J.), entered June 1, 2016, which granted defendant's CPLR 3211 motion to dismiss the complaint, should be modified, on the law, to deny the motion as to the first cause of action for breach of contract, and otherwise affirmed, with costs against respondent.

SWEENY, J.P., MANZANET-DANIELS, ANDRIAS and WEBBER, JJ., concur.

Order, Supreme Court, New York County, entered June 1, 2016, modified, on the law, to deny the motion to dismiss the first cause of action for breach of contract, and otherwise affirmed, with costs against respondent.